784 So.2d 29 (2001)
STATE of Louisiana
v.
Sean I. MONROE.
No. 00-KA-1354.
Court of Appeal of Louisiana, Fifth Circuit.
March 28, 2001.
*31 Paul D. Connick, Jr., District Attorney, Rebecca J. Becker, Terry Boudreaux, Quentin P. Kelly, Assistant District Attorneys, Gretna, LA, Counsel for State.
J. Rodney Baum, Baton Rouge, LA, Counsel for defendant-appellant.
Court composed of Judges CANNELLA, McMANUS and ROTHSCHILD.
McMANUS, Judge.
Defendant, Sean I. Monroe, appeals his conviction for armed robbery and the subsequent multiple offender conviction and sentence. We affirm defendant's conviction, but remand the matter for re-sentencing and corrections of errors patent.

STATEMENT OF THE CASE
On February 18, 1999, the Jefferson Parish District Attorney filed a bill of information charging defendant, Sean I. Monroe, with the armed robbery of Ms. Shakyra Murphy and Ms. Andrea Duhe, a *32 violation of LSA-R.S. 14:64. Defendant was arraigned and pled not guilty on February 23, 1999. On February 29, 1999, the defendant filed a motion for preliminary examination and motion to suppress the identification, confession and statement. Defendant's motion to suppress identification, confession and statement was denied on April 1, 1999. Also on that date, the court found probable cause to charge defendant with two counts of armed robbery. Defendant filed a motion to reopen the suppression hearing, or in the alternative, to reconsider his motion to suppress his statement, which the court denied on September 20, 1999.
On September 22, 1999, the Jefferson Parish District Attorney amended the bill of information and split the charge into 2 counts: count 1, the armed robbery of Shakyra Murphy; and count 2, the armed robbery of Ms. Andrea Duhe, both violations of LSA-R.S. 14:64. Defendant was rearraigned and pled not guilty. On September 22 and 23, 1999, the case was tried before a 12-person jury, which unanimously found defendant guilty as charged. Defendant was sentenced to eight years imprisonment at hard labor on count 1 and eight years imprisonment at hard labor on count 2, with the sentences to run concurrently, on October 21, 1999. The state filed a multiple offender bill of information alleging defendant to be a third felony offender. Defendant denied the allegations of the multiple bill. Also on October 21, 1999, defendant filed a notice of appeal that was granted.[1]
Defendant filed an answer to the multiple offender bill of information on December 8, 1999. On February 10, 2000, defendant was found to be a third felony offender and sentenced to life imprisonment without benefit of parole, probation or suspension of sentence, with that sentence to run consecutively with the eight-year sentence on count 1. Although the minute entry indicates that the original sentence on count 2 was vacated before defendant was sentenced under the multiple bill statute, the transcript indicates that it was not. Defendant filed a motion to reconsider sentence which was denied on March 10, 2000.

FACTS
The state introduced evidence at the motion to suppress hearing and at trial to show that on December 8, 1998, at approximately 10:00 a.m., defendant robbed Andrea Duhe and Shakyra Murphy at the Easy Money Store in Harahan, Louisiana while armed with a gun. The defense introduced evidence to show that defendant did not commit this crime, that this was a case of mistaken identity. The following testimony was elicited at the hearing on the motion to suppress and at trial.
Andrea Duhe testified for the state that on December 8, 1998, at approximately 10:00 a.m., she was working at the Easy Money Store in Harahan, Louisiana. As she was sitting at her desk near the window, she saw defendant walk past the window with a navy blue knit cap rolled on his head. The cap was not covering his face. When he entered the door, he stopped, pulled down the mask over his face, pulled out a gun from underneath his shirt, pointed it at her and told her to get off the phone. Duhe hung up the phone, and defendant pointed the gun at Shakyra Murphy and told her to get off the phone. Murphy hung up the phone, and he told *33 her to give him the money. Murphy emptied the money from the cash drawer onto the floor, and he told Murphy and Duhe to go into the bathroom. Murphy and Duhe went to the back of the store, ran out the back door, and went to Sclafani's Chicken and Ribs, a business next door. Duhe told the people next door to call the police. In connection with the robbery, Duhe was shown a series of six color photographs, within days of the crime, and asked whether she could identify anyone. Duhe identified photograph number 2, the defendant, as the robber. Duhe had seen him the day before the robbery, on December 7, 1998, when he had come into the store to fill out a loan application. On that day, Murphy introduced Duhe to defendant. Shakyra Murphy testified that she went to middle school with defendant, and that they dated. She first met defendant in the seventh or eighth grade when she was about 13 or 14 years-old, and she had known defendant for about 12 or 13 years. She considered him a friend. Murphy saw defendant on December 7, 1998, the day before the robbery at Easy Money when he came in to get a loan. She spoke to him on that day and helped him fill out an application. Murphy introduced her co-worker, Andrea Duhe, to defendant. Murphy spent about two or three hours with defendant that day at Easy Money. About 10:00 a.m. the following day, a man robbed her and Duhe while they were working at Easy Money. Defendant and his girlfriend, Temika Parker, went to Murphy's house at 9:00 p.m. the night of the robbery. Defendant told Murphy that he wasn't the one who robbed her. Murphy told him that she didn't care who robbed her, whether it was him or someone else, she just wanted to "get the person who robbed me." Murphy remembered giving a statement to the police a couple of days after the robbery, which Murphy read and signed after it was typed. At trial, she didn't recall saying that the man who robbed her looked like defendant from the feet to the neck. She didn't recall telling the officer that the robber walked and spoke like the defendant.
Detective Joe Almerico of the Harahan Police Department testified for the state that he received a call at about 10:50 a.m. regarding a robbery in progress at the Easy Money Store. Almerico learned that a red or maroon Beretta vehicle was used in the robbery. When he got to the scene, he learned from the reporting officer and the victims that Sean Monroe had committed the robbery, and that Monroe had come into the store the day before and applied for a loan, which is how one of the victims recognized him. Almerico went to the store and spoke to Murphy, who produced defendant's loan application which contained addresses of defendant's relatives and a copy of defendant's driver's license. He ran defendant's name through the computer system. The search showed that a red or maroon Beretta was registered to defendant.
The officers tried to locate Monroe. There were several addresses listed on his application, and the officers went to each location numerous times. They couldn't locate Monroe or his vehicle. Almerico called Monroe's cell phone number, and he answered. Almerico said defendant was cooperative and wanted to meet with the officers about the situation. Defendant told them he was at his apartment, but when the detectives got there, defendant was not there. They called Monroe back on his cell phone, but there was no answer. A couple of days later, they saw Monroe's vehicle, a two-door maroon Beretta, at the apartment complex. They ran the license plate through the computer to confirm it was Monroe's vehicle, which it was.
They went back to the apartment complex and took statements from Temika *34 Parker and Sean Monroe on December 10, 1998. Almerico read defendant his constitutional rights before his statement was taken. Defendant indicated that he understood those rights, and he did not ask for an attorney. Following that initial statement, defendant's girlfriend, Temika, called Almerico a few times and told him that defendant wanted to speak to him about the case. Therefore, while Almerico was at the Jefferson Parish Correctional Center on another case, he went upstairs and took another statement from the defendant on December 21, 1998. Sergeant Fanguy was also present. Almerico did not remember whether he read defendant his rights again before he interviewed him. Sergeant Kevin Hollingsworth and Officer Chris Graham of the Harahan Police Department testified for the state, and their testimony largely corroborated that of Detective Almerico.
Sharon Prestenbach, a delivery driver for Sclafani's Chicken and Ribs, testified for the state that on December 8, 1998, at approximately 10:50 a.m., she was about to make a delivery when a maroon two-door Beretta pulled up next to her, and she waited for it to pass. Prestenbach thought the car looked suspicious because it was moving slowly, and because the driver and the passenger watched her to see what she was going to do. She noticed the car and the actions of the occupants because she carried a lot of money and feared that she might be a target. She was gone on her delivery for about five to ten minutes. When she returned there was no vehicle there. Prestenbach identified state's exhibit numbers 3, 4, 5, and 6, photographs of defendant's car, as the car that was outside the restaurant on December 8, 1998.
Mary Dixon, defendant's mother, testified for the defense at trial that at 11:00 a.m. on December 8, 1998, defendant's girlfriend, Temika, called her on the telephone, and Dixon could hear her son's voice in the background.
Temika Parker, defendant's girlfriend, testified that she and Monroe had been running errands on the morning of December 8, 1998. At trial, she stated that she and Monroe registered her daughter at Little Woods Elementary School on December 8, 1998, between 8:00 a.m. and 9:00 a.m., and met with a teacher for about 30 minutes. Parker testified that they went home, and almost immediately received a phone call from Monroe's father, who asked Monroe to pick something up at Auto Zone. Parker testified that she had not been aware of what time Monroe had spoken with his father on the phone, but that it must have been between 9:30 and 10:00. She stated that the two ran the errand for Monroe's father and returned home. As soon as they returned home, however, Monroe left again. She initially stated that though she wasn't sure what time he left, he had returned within 10 minutes, at about 11:30. At a later point in her testimony, Parker testified that she and Monroe got home about 10:30 a.m. after running errands, that Monroe went out immediately, and that he got back about 12:00 p.m. Finally, Parker stated that she had gone to collect one of her children from school at 3:15 that afternoon.
During the investigation into the crime, when Parker initially gave her statement to the police, she told the officer that she wasn't sure what time they returned home from the school. She did state, during the investigation and at trial, that she was unsure of exactly when she and Monroe had done things on the day in question because they had just moved into their apartment and did not yet have a clock.

ASSIGNMENT OF ERROR NUMBER ONE
As his first assignment of error, defendant argues that the trial court erred by *35 denying his motion to suppress the statement taken by Harahan police officers at the parish prison after the defendant had been appointed counsel.
Defendant contends that the trial court improperly denied his motion to suppress the second statement taken on December 21, 1998, by Harahan police officers at the parish prison, after the defendant had already been appointed counsel on December 17, 1998. Defendant claims that the officers did not advise him of his Miranda rights before the statement was taken, that the officers did not ask him if he had an attorney or wanted his attorney present, and that he did not waive his right to counsel. Defendant argues that his right to counsel attached when counsel was appointed on December 17, 1998, and that once the right to counsel attaches, it cannot be waived, according to State v. Hattaway, 621 So.2d 796 (La.1993). The state responds that defendant initiated the conversation with the officers and, thus, waived his right to counsel; that defendant's statement was knowing, intelligent and voluntary; and that the trial judge's decision to deny defendant's motion to suppress the second statement was correct. The state contends that Hattaway was overruled by State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367, 374, and that a defendant can make a valid waiver of his right to counsel as long as it is knowing, intelligent and voluntary.
The decision to deny a motion to suppress is afforded great weight, and it will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Williams, 98-1006 (La. App. 5 Cir. 3/30/99), 735 So.2d 62, 73. In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion, but may also consider pertinent evidence given at the trial. State v. Bell, 97-1134 (La.App. 5 Cir. 2/25/98), 709 So.2d 921, 923.
The law regarding a defendant's right to counsel was discussed in State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367. In Carter, defendant was arrested for rape and battery and appeared in magistrate court for an initial appearance. At the appearance, the judge appointed a public defender to represent defendant. Two days later, an officer met with defendant in jail, advised him of his rights, and asked him if he wanted to make a statement. Defendant said he did and that he understood his rights. He signed a wavier of rights form which included the right to remain silent and to have an attorney present during questioning, and which notified defendant that any statements he might make could be used against him at trial. Defendant thereafter made a statement. He subsequently filed a motion to suppress the statement which was denied.
The Louisiana Supreme Court in Carter held that where a defendant's federal and state constitutional right to counsel has attached, but where defendant has not asserted or invoked the right which has attached, he may validly waive his right to counsel during an interrogation, provided the waiver is knowing, intelligent and voluntary. The court in Carter found that defendant had not asserted or invoked his right to counsel because the transcript of the initial appearance did not show that defendant indicated that he wanted to deal with the police only through counsel. The court stated that "something more than mere mute acquiescence in the appointment of counsel was necessary to show that defendant has asserted his right to counsel...." Carter, 664 So.2d at 383.
Once the court in Carter concluded that defendant failed to assert his right to counsel, it next considered whether defendant *36 validly waived his right to counsel. The court found that to show a knowing and intelligent waiver of the right to counsel, the state must prove "an intentional relinquishment or abandonment of a known right or privilege." In other words, a defendant may waive his right to counsel "if he knows what he is doing and his choice is made with eyes open." The court further stated that a statement or confession is voluntary only if it is the product of defendant's uncoerced free will. Carter, 664 So.2d at 385.
The court in Carter, after analyzing the law in Patterson v.. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), found that in the context of the waiver of right to counsel in an interrogation, Miranda warnings given to a defendant prior to his making a statement will suffice to meet the state's burden of proving that the statement was given as a result of a knowing and intelligent waiver of the Sixth Amendment and La. Const. Art. I, sec. 13 right to counsel. In Carter, the court reviewed a report in the record which summarized the detective's interrogation of defendant. The report indicated that defendant was formally advised of his rights via two forms, one of which was a "Rights of Arrestee or Suspect" form. The form was signed by defendant and indicated that he was apprised he had the right to the assistance of counsel both before and during questioning. Consequently, under Patterson, the court in Carter found that the state had met its burden of proving defendant made a knowing and intelligent waiver of his right to counsel. The court also found that the state proved defendant's waiver of his right to counsel was voluntary because the detective testified that defendant was not coerced or pressured into making a statement, and that the statement was a product of defendant's free will. Because the court in Carter found that defendant did not invoke or assert his right to counsel and subsequently made a valid waiver, the court declined to revisit the issue of whether or not the right to counsel attaches at the initial appearance, as was previously held in State v. Hattaway, 621 So.2d 796 (La.1993). State v. Carter, 664 So.2d at 370.
The Louisiana Supreme Court in Carter overruled, in part, Hattaway. In Hattaway, the court held that once adversarial proceedings began, and counsel had been appointed, the state could not communicate with defendant about any offense related to the proceedings or obtain a valid waiver of his right to counsel for that purpose except through medium of his attorney. Hattaway, 621 So.2d at 808. However, in Carter, the court overruled Hattaway in part, and held that under the Sixth Amendment, a defendant who has appointed counsel but who has not otherwise asserted or invoked his right to counsel can make a waiver of his right to counsel in the absence of his attorney if the waiver is voluntary, knowing, and intelligent. Carter, 664 So.2d at 370.
In the instant matter, a review of defendant's arguments and the state's responses reveals the following issues: (1) whether defendant's right to counsel attached prior to the second statement; (2) whether defendant asserted or invoked his right to counsel prior to the second statement; and (3) whether defendant made a knowing, intelligent and voluntary waiver of his right to counsel before he gave his second statement.
Defendant gave his first statement on December 10, 1998. Detective Almerico testified that he read defendant his constitutional rights before that statement was taken by Sergeant Kevin Hollingsworth. Defendant indicated that he understood those rights, and he did not ask for an *37 attorney. In his initial statement, Monroe told the investigating officers that he had not allowed anyone else to use his car at any time on the day in question. That statement is not at issue here. Almerico testified that after the initial statement was taken, defendant's girlfriend, Temika, called Almerico a few times and told him that defendant wanted to speak to him about the case. Therefore, while Almerico was at the Jefferson Parish Correctional Center on another case, he went upstairs and took a second statement from the defendant on December 21, 1998. Sergeant Fanguy was also present. Almerico did not remember whether he read defendant his rights again before he interviewed him. Defendant told him that they had the wrong guy and that he wanted to get out of jail. Defendant insinuated he knew who committed the robbery. He told Almerico that he lied about the vehicle and said that somebody did use his car on the day of the robbery. Defendant stated that Temika had lied to protect him. He told Almerico that rather than asking defendant whether he committed the armed robbery, Almerico should have asked whether defendant knew who committed the armed robbery. Defendant said that he could tell Almerico who did it, but first he wanted to get out of jail. Almerico advised him that the DA's office and the judge would have to intervene, and when he had the evidence to produce, Almerico would contact the DA's office or the judge and they could work out something to get him out of jail on bond.
The first issue is whether defendant's right to counsel had attached prior to his second statement on December 21, 1998. According to Hattaway, the right to counsel attaches no later than a defendant's initial court appearance or first judicial hearing and thereafter applies to those pre-trial proceedings which would be considered "critical stages." The court in Carter stated it was clear that interrogation of the defendant, when occurring after the attachment of the right to counsel, is a "critical stage" of the proceeding entitling defendant to the presence of an attorney. Carter, 664 So.2d at 373. In the instant matter, the record indicates that defendant was appointed counsel at the initial court appearance on December 17, 1998. Because defendant made his initial court appearance, and because the interrogation by Detective Almerico would be considered a "critical stage" of the proceedings, it appears that defendant's right to counsel had attached prior to his second statement.
The next issue is whether defendant invoked or asserted his right to counsel prior to giving the second statement. In the instant case, defendant does not allege in his brief nor does it appear from Detective Almerico's testimony or any other testimony that defendant requested counsel during the interrogation itself. Therefore, the issue to be resolved is whether defendant had previously asserted or invoked his right to counsel at the initial appearance. A review of the record reveals no transcript of defendant's initial appearance. Further, there is nothing else in the record which would indicate whether or not defendant asserted or invoked his right to counsel at his initial appearance or prior to the interrogation. If defendant asserted or invoked his right to counsel prior to the interrogation, then any subsequent waiver of his right to counsel is invalid. On the other hand, if defendant did not assert or invoke his right to counsel prior to the interrogation, the issue becomes whether defendant validly waived his right to counsel. For a waiver to be valid, it must be knowing, intelligent, and voluntary. Carter, 664 So.2d at 385.
Before an inculpatory statement, made during a custodial interrogation, may *38 be introduced into evidence, the state must prove beyond a reasonable doubt that the defendant was first advised of his Miranda rights and that the statement was made freely and voluntarily, and not under the influence of fear, intimidation, menaces, threats, inducement or promises. State v. Quest, 00-205, p. 3 (La.App. 5 Cir. 10/19/00), 772 So.2d 772, citing LSA-R .S. 15:451; State v. Comeaux, 93-2729, p. 47 (La.7/1/97), 699 So.2d 16, cert. denied, 522 U.S. 1150, 118 S.Ct. 1602, 16 L.Ed.2d 694 (1998); State v. Watts, 98-1073 (La.App. 5 Cir. 5/19/99), 735 So.2d 866, 869.
In the present case, Detective Almerico testified that he did not promise defendant anything or coerce him in any manner before he gave his second statement. Therefore, it appears that defendant's second statement was voluntary. However, Detective Almerico testified that he did not remember whether or not he read defendant his constitutional rights before he took defendant's second statement. Further, there are no forms signed by defendant in the record indicating that defendant waived his constitutional rights. Because the record does not show that defendant was advised of his rights before he gave the second statement, we cannot say that defendant made a knowing and intelligent waiver of his right to counsel. Therefore, the second statement should have been suppressed.
A finding that the trial court erred in failing to suppress a confession does not end our inquiry, however, because the erroneous admission of a confession or a statement is a trial error which is subject to harmless error analysis. State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756. State v. McCorkle, 97-966 (La.App. 5 Cir. 2/25/98), 708 So.2d 1212, 1217, citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
An error is harmless if it does not affect substantial rights of an accused. LSA-C.Cr.P. art. 921. Such errors are harmless if a guilty verdict was surely unattributable to the error. State v. Code, 627 So.2d 1373, 1384; State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, 78 (citations omitted).
In the instant case, Andrea Duhe positively identified defendant as the individual who robbed her. Duhe had seen the defendant when he came into Easy Money the day before the robbery to fill out a loan application. Shakyra Murphy, defendant's friend, told the police officers that the individual who robbed her looked like the defendant from the neck down. Detective Joe Almerico testified that he received a call about 10:50 a.m. regarding a robbery in progress at the Easy Money store. He learned that a maroon two-door Beretta was used in the robbery. A search showed the defendant owned a maroon two-door Beretta. Sharon Prestenbach, delivery driver for Sclafani's, identified a photograph of defendant's vehicle as the vehicle she saw next to Easy Money at about 10:50 a.m. Further, defendant did not admit to committing the robbery in his second statement.
We cannot ignore the fact that defendant claimed in his second statement that his girlfriend, Temika Parker, had lied to protect him, and must acknowledge that this may have hurt his defense since Parker was used as an alibi witness at trial. However, there can't be too much doubt that Parker's credibility was damaged by her own testimony during the trial. For while she claimed to have been uncertain of the time throughout the morning in question, and contradicted herself repeatedly, she was nevertheless certain that the activities had taken place during the period in which the crime was committed. And though she testified that her confusion *39 regarding the time during the morning in question had been due to the couple's lack of a clock in their apartment, she was able to testify that Monroe returned from his later errand within ten minutes of having left the house, and was able to testify that she had gone to school at 3:15 to pick up her child from school.
And finally, we note that Monroe did present the testimony of one other alibi witnesshis momwho testified that she had been able to hear his voice in the background while she spoke with Parker on the telephone close to the time during which the crime occurred.
Given the above, if it was error to have admitted Monroe's second confession, the error was harmless.

ASSIGNMENT OF ERROR NUMBER TWO
As defendant's second assignment of error, he argues that the state did not prove beyond a reasonable doubt that he had been convicted of the previous felonies necessary to support a conviction as a multiple offender and further, that the court did not vacate the original sentence prior to the imposition of the multiple bill sentence.
Defendant argues that the state failed to prove that he had been convicted of the previous felonies necessary to support his enhanced sentencing as a multiple offender. He contends that Lt. Adams, the state's fingerprint expert, was unable to make an identification between the fingerprints relating to one of the predicate felonies and those she had just taken from defendant in court. Defendant also argues that the Boykin form associated with that predicate felony had a different case number on it, and that the state did not furnish a verbatim transcript of the plea as required by State v. Shelton, 621 So.2d 769 (La.1993). The state responds that it proved defendant was the same person who had been convicted of the two previous felonies listed in the multiple offender bill of information, and that the guilty pleas for the prior felony convictions were constitutional.
In State v. Hollins, 99-278 (La.App. 5 Cir. 8/31/99), 742 So.2d 671, 684-685, this court set forth the pertinent law regarding the method to be used to prove that a defendant is a habitual offender:
To prove that a defendant is an habitual offender, the State must establish by competent evidence the prior felony convictions and that defendant is the same person who was convicted of the prior felonies. State v. Chaney, 423 So.2d 1092, 1103 (La.1982); State v. Bailey, 97-302 (La.App. 5 Cir. 4/28/98), 713 So.2d 588, 610, writ denied, 98-1458 (La.10/30/98), 723 So.2d 971. The State may establish this by various means, such as the testimony of witnesses to prior crimes, expert testimony matching fingerprints of the accused with those in the record of prior proceedings or photographs contained in a duly authenticated record. State v. Bailey, 713 So.2d at 610; State v. Brown, 514 So.2d 99, 106 (La.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988). The State must further show that the prior convictions fall within the ten year cleansing period prescribed by La. R.S. 15:529.1(C); Bailey, 713 So.2d at 610.
Where a prior conviction resulted from a guilty plea, the State must show that the defendant was advised of his constitutional rights and that he knowingly waived those rights prior to the guilty plea, as required by Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); State v. Shelton, *40 621 So.2d 769 (La.1993); State v. Bailey, 713 So.2d at 610. If defendant denies the allegations of the bill of information, the State has the burden of proving the existence of the prior guilty pleas and that defendant was represented by counsel. Shelton, 621 So.2d at 779; Bailey, 713 So.2d at 610. Once the State meets this burden, defendant must produce some affirmative evidence of an infringement of his rights or of a procedural irregularity. Shelton, 621 So.2d at 779; Bailey, 713 So.2d at 610. Thereafter, the State must prove the constitutionality of the plea. Shelton, 621 So.2d at 779; Bailey, 713 So.2d at 610.
In proving the constitutionality of the plea, the State must produce either a "perfect" transcript of the Boykin colloquy between the defendant and the trial judge or any combination of (1) a guilty plea form, (2) a minute entry, or (3) an "imperfect" transcript. Shelton, 621 So.2d at 780. If anything less than a "perfect" transcript is presented, the trial court must weigh the evidence submitted by the defendant and the State to determine whether the State met its burden of proof that defendant's prior guilty plea was informed and voluntary. Shelton, 621 So.2d at 780.
State v. Hollins, 99-278 (La.App. 5 Cir. 8/31/99), 742 So.2d 671, 684-685.
In the instant case, the state presented testimony from Lt. Patricia Adams of the Jefferson Parish Sheriffs Office, who was qualified as a fingerprint expert. She testified that she took defendant's fingerprints prior to the habitual offender hearing. During Lt. Adams's testimony, the state introduced certified copies of the bill of information, the minute entry showing defendant's guilty plea, the waiver of rights, the constitutional rights form, the plea of guilty, and the arrest register relating to Orleans Parish case number 342-203. These records show that Sean Monroe was convicted of possession of cocaine on May 15, 1990. The state introduced certified copies of the arrest register, fingerprint copy, from the New Orleans Police Department, which was a certified copy of the same April 11, 1990, arrest register as found in state's exhibit 3; however, state's exhibit 4 was a darker copy and contained both palm prints and fingerprints. The state also introduced certified copies of the bill of information, the minute entry showing that defendant pled guilty, the plea of guilty form signed by defendant, the arrest register, and the minutes contained in the court record relating to Orleans Parish case number 345-826. These records show that Sean Monroe was convicted of possession of stolen property on November 29, 1990.
Lt. Adams testified that the fingerprints she took from defendant, state's exhibit 2, matched the fingerprints found on the arrest register, state's exhibit 4. She stated that the two fingerprints contained on state's exhibit 3 did not contain enough points for a proper identification. Lt. Adams claimed that the fingerprints on state's exhibit 2 matched the fingerprints found on the back of the bill of information in state's exhibit 5.
Defendant contends that Lt. Adams was unable to make an identification between the fingerprints in exhibit 3 pertaining to case number 343-203 and those she had just taken in exhibit 2. Although Adams could not make that identification, she did match defendant's fingerprints in exhibit 2 with those contained on the arrest register in exhibit 4, which was a certified copy of the same April 11, 1990, arrest register as found in state's exhibit 3. This Court has held that testimony comparing a defendant's current fingerprints with those found on prior arrest records is sufficient to prove that defendant was the person *41 convicted of a prior felony. State v. Bell, 97-1134 (La.App. 5 Cir. 2/25/98), 709 So.2d 921, 926, writ denied, 98-0792 (La.9/16/98), 721 So.2d 477. The state presented sufficient evidence to prove that defendant was convicted of possession of cocaine in case number 343-203.
Defendant also argues that the Boykin form associated with case number 343-203 had a different case number on it, 342-323, and that the state did not furnish a verbatim transcript of the plea in case number 343-203 as required by State v. Shelton, 621 So.2d 769 (La.1993). The state presented evidence that defendant pled guilty in case number 343-203. It introduced certified copies of the bill of information, the minute entry showing defendant's guilty plea, the waiver of rights, the constitutional rights form, the plea of guilty and the arrest register relating to case number 343-203. The state argues that the minute entry reflected the proper case number, and that the substance of the guilty plea form showed that the plea was entered for a charge of possession of crack cocaine and reflected the same sentence imposed in the minute entry on that date. According to Shelton, the burden then shifted to defendant to affirmatively prove an infringement on his rights or a procedural irregularity in the taking of the plea itself. In the instant case, defendant showed a procedural irregularity by pointing out that the Boykin form associated with case number 343-203 contained a different case number on it, 342-323. (However, a review of the Boykin form in question shows that it contains case number 342-203).
Thereafter, the state must prove the constitutionality of the plea. In proving the constitutionality of the plea, the state must produce either a "perfect" transcript of the Boykin colloquy between the defendant and the trial judge or any combination of (1) a guilty plea form, (2) a minute entry, or (3) an "imperfect" transcript. If anything less than a "perfect" transcript is presented, the trial court must weigh the evidence submitted by the defendant and the state to determine whether the state met its burden of proof that defendant's prior guilty plea was informed and voluntary. In the instant case, the state did not produce a "perfect" transcript of the Boykin colloquy between the defendant and the trial judge. Therefore, the trial court was required to weigh the evidence to determine whether the state met its burden of proof. The trial judge stated:
After hearing the testimony of this witness, and you may step down, Madam, and considering the evidence as offered and the Court certainly thanks the arguments advanced by both State and the defendant, we are persuaded that the totality of the circumstances as indicated herein today as a result of this hearing, while there may be, as defense counsel points out some irregularities, if that's an appropriate term, we do not find that these irregularities are so fatal and so wanting for lack of explanation that the State has failed to maintain its burden. Quite the contrary, we find that the State has maintained its burden and will grant the relief requested at this time.
The trial judge weighed the evidence as required by Shelton, and found that the irregularity in case numbers was not "so fatal and so wanting for lack of explanation that the State failed to maintain its burden." Therefore, based on the foregoing, we agree with the trial judge that sufficient evidence was produced to support a finding that defendant was a third felony offender.
Defendant argues that the trial court erred by imposing a life sentence *42 without vacating one of the previous, original sentences.
LSA 15:529.1D(3) provides in pertinent part:
When the judge finds that he has been convicted of a prior felony or felonies or adjudicated a delinquent as authorized in Subsection A, or if he acknowledges or confesses in open court, after being duly cautioned as to his rights, that he has been so convicted or adjudicated, the court shall sentence him to the punishment prescribed in this Section, and shall vacate the previous sentence if already imposed, deducting from the new sentence the time actually served under the sentence so vacated
. . .
When sentencing defendant after the multiple offender hearing, the trial judge stated:
Mr. Monroe, inasmuch as you've been found guilty of two counts of armed robbery pursuant to La. R.S. 14:64 and sentenced on October 21, 1999 to eight years at hard labor for each count of armed robbery without benefit of probation, parole or suspension of sentence, and inasmuch as that conviction was the third felony conviction, and inasmuch as this Court granted the multiple bill pursuant to La. R.S. 15:529.1 in regard to the armed robbery conviction as to count no. 2, the previous sentence of this Court in relation to that conviction is hereby and you are sentenced as follows:
. . .
As can be seen, the transcript indicates that the trial judge did not actually utter the word "vacated."
This Court has consistently ruled that, where the original sentence on the underlying offense has not been vacated before the habitual offender sentence is imposed, the defendant's original sentence remains in effect and the subsequent sentence as a multiple offender is null and void. State v. Carter, 96-358 (La.App. 5 Cir. 11/26/96), 685 So.2d 346; State v. Jackson, 95-423 (La.App. 5 Cir. 11/15/95), 665 So.2d 467.
Therefore, we are without a choice but to remand the matter for re-sentencing, once the trial judge has properly vacated the sentence on the original felony count.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals errors patent in this case.
Defendant argues that he was not given credit for time served on the sentence imposed in accordance with LSA-C.Cr.P. art. 880 which provides as follows:
A defendant shall receive credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence.
Although the commitment reflects that the defendant was given credit for time served, the sentencing transcript indicates that the trial court failed to grant such credit. However, the legislature has reenacted article 880 to make the credit for prior custody self-operating. Thus, it is no longer necessary for this Court to amend the defendant's sentence to reflect credit for time served. State v. Rainey, 98-436 (La.App. 5 Cir. 11/25/98), 722 So.2d 1097, 1107, writ denied, 98-3219 (La.5/7/99), 741 So.2d 28.
The trial judge did not inform defendant of the prescriptive period for post-conviction relief as is mandated by LSA-C.Cr.P. art. 930.8 either at the time of the original sentencing or after he was sentenced as a multiple offender. LSA-C.Cr.P. art. 930.8 provides that a court *43 shall not consider an application for post-conviction relief, including applications which seek an out-of-time appeal, if the application is filed more than two years after the judgment of the conviction and sentence has become final. Therefore, trial court shall advise defendant of the provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of its opinion and then shall file written proof that defendant received the notice in the record of these proceedings. State v. George, 99-887 (La.App. 5 Cir. 1/4/00), 751 So.2d 973, 975.
The trial judge did not advise defendant of his multiple offender rights as required by LSA-R.S. 15:529.1, which provides that the trial court shall order the defendant to appear before it and shall inform him of the allegations contained in the information and of his right to be tried as to the truth thereof according to law, and shall require the offender to say whether the allegations are true. The statute also requires that the trial court advise defendant of his right to remain silent. In State v. Dearmas, 606 So.2d 567, 569 (La.App. 5 Cir.1992), this Court held that the failure of the trial court to advise the defendant of his right to a trial and to remain silent was harmless error where the multiple offender status was established by competent evidence offered by the state at the hearing, rather than by admission of the defendant. In the instant case, defendant denied the allegations of the multiple bill, and the state presented competent evidence at a hearing to establish defendant's multiple offender status. As such, it appears that the trial court's failure to advise defendant of the specific allegations against him and of his right to be tried and to remain silent was harmless error.
Therefore, for the above reasons, defendant's conviction is affirmed, and the matter is remanded for re-sentencing on the multiple offender conviction, and to allow the trial judge to comply with notice requirements regarding defendant's right to post conviction relief.
CONVICTION AFFIRMED; REMANDED FOR RE SENTENCING AND FOR CORRECTION OF PATENT ERRORS.
NOTES
[1] Defendant's motion for appeal was premature when it was filed after conviction and sentence, but before the sentence as a multiple offender. However, that procedural defect was cured by the subsequent re-sentencing. State v. Balser, 96-443 (La.App. 5 Cir. 11/14/96), 694 So.2d 351.