815 So.2d 224 (2002)
STATE of Louisiana
v.
James ODOMS.
No. 01-KA-1033.
Court of Appeal of Louisiana, Fifth Circuit.
March 26, 2002.
*225 Paul D. Connick, Jr., District Attorney, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux, Thomas J. Butler, Donald A. Rowan, Jr., Frank A. Brindisi, *226 Bradley R. Burget, Assistant District Attorneys, Gretna, LA, for State of Louisiana, Plaintiff-Appellee.
Michael Thiel, Hammond, LA, for James Odoms, Defendant-Appellant.
Panel composed of Judges SOL GOTHARD, CLARENCE E. McMANUS and WALTER J. ROTHSCHILD.
ROTHSCHILD, Judge.
On June 29, 1999, the defendant, James Odoms, was charged by bill of information with possession of between 200 and 400 grams of cocaine, in violation of LSA-R.S. 40:967.F. He was arraigned on June 30, 1999, and he entered a plea of not guilty. The defendant proceeded to trial on September 12, 2000, and a 12 person jury found him guilty as charged. The defendant filed a "Motion for Judgment of Acquittal Notwithstanding the Verdict" and a "Motion for New Trial," which were both denied by the trial judge on October 31, 2000. On that same date, the trial judge sentenced the defendant to 30 years of imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. The defendant filed a "Motion for Appeal" which was granted by the trial judge on November 6, 2000.[1]
On February 2, 2001, the State filed a multiple offender bill of information alleging that the defendant was a third felony offender. A hearing on the multiple bill was held on July 19, 2001, and the trial judge found the defendant to be a third felony offender. Thereafter, on the date of the multiple bill hearing, the trial judge vacated the defendant's original sentence and re-sentenced him as a third felony offender to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, in accordance with LSA-R.S. 15:529.1 A(1)(b)(ii).

FACTS
On March 22, 1999, after receiving information from a confidential informant, Agent Steven Reyes[2] and Agent John Pacaccio of the Jefferson Parish Sheriffs Office Narcotics Division set up a drug investigation surveillance of a residence located at 2057 Paine Street in Marrero, Louisiana, which was owned by Ms. Rosie Odoms. Agents Reyes and Pacaccio observed the residence for approximately two hours on March 22, 1999, with each agent occupying an unmarked vehicle approximately 70 yards from the residence. One police unit was located at the south end of the street and the other unit was at the north end of the street. The surveillance began at 10:00 a.m. and, at about 11:00 a.m., there were a number of people coming and going from the residence on foot and in automobiles. The people would stay for a short time and then leave. It was at this time that the defendant, James Odoms, was first seen frequenting the house.[3] The agents left the scene and then returned in the afternoon.
According to Agent Reyes, the agents came and went from the scene in order to avoid being detected because they are white and the neighborhood is primarily black. When they returned in the afternoon, they observed the same type of activity that they had seen in the morning. *227 People would come to the residence, stay for a short period of time, and then leave. On this date, the defendant was seen three times as he came out of the house and talked with different people.
The surveillance continued on March 23, 1999 and, on that date, the defendant was seen entering the house on two occasions, once about 10:30 a.m. and again in the afternoon. Based on this activity and the information provided by the confidential informant, Agents Reyes and Pacaccio sought and were granted a search warrant for the residence.
On the morning of March 24, 1999, the two officers drove by the residence and again saw the defendant. At about 11:00 a.m., Agents Reyes and Pacaccio, accompanied by Lieutenant McNally, and Detectives Horn and Greer, aided by a canine, came to the residence to execute the search warrant. The agents made a forceful entry into the residence using a halogen tool.
Once inside the residence, the police conducted a room-to-room sweep of the house. Rosie Odoms was located in the living room-kitchen area, and her daughter and grandchild were in a hallway bathroom. These were the only occupants of the house at the time, and they were instructed to assemble at the kitchen table with Agent Pacaccio. At this time, Ms. Odoms was advised that her son, James, was suspected of selling narcotics.
Upon conducting a room-by-room search of the residence, Agent Reyes encountered a locked bedroom, and he pried the door open. Inside the bedroom, there was a closet with a deadbolt lock on it. When the canine was brought to this room, he began to claw, bite, and bark at the closet, indicating the presence of drugs. The closet door was opened using the halogen tool. Inside the closet, Agent Reyes found several items, including: three jackets, each containing what appeared to be powder and/or crack cocaine; a digital scale; a shoe box containing a large amount of what appeared to be cocaine; currency in the amount of $100; two gold bracelets, one of which had the name "Alonzo" on it; a pay stub dated August 1992, which was in the defendant's name and had the address of Ms. Odoms' residence on it; and a colored bag containing a number of plastic bags.
Agent Pacaccio received the recovered items from Agent Reyes and listed them on the return for the search warrant. The suspected drugs were later turned over to the crime lab for testing and these items tested positive for cocaine in the amount of 288 grams.
Following the recovery of these items, the defendant's mother was advised of her rights. According to Agents Reyes and Pacaccio, Ms. Odoms was very upset that the police were in her home and that her residence was being used for drug activity. However, she cooperated with the investigation. She informed the agents that the room where the drugs were located belonged to her sons, James and Alonzo. She identified one of the jackets as belonging to Alonzo and the other two jackets as belonging to James. She told Agent Reyes that James sometimes lived with a female in an apartment, but she did not give an address for the apartment.
Warrants were issue for the arrest of James and Alonzo Odoms. James Odoms was arrested in June 1999 and, as of the time of the trial, Alonzo was a fugitive.

LAW AND DISCUSSION
In his first assignment of error, the defendant contends that the trial court erred in allowing testimony from Agent Reyes regarding hearsay statements made by the defendant's mother, Rosie Odoms. In particular, he objects to the admissibility *228 of Agent Reyes' testimony wherein he relayed to the court that the defendant's mother had identified the locked bedroom where the narcotics were found as being occupied by her sons, James and Alonzo. He also objects to Agent Reyes' testimony indicating that Ms. Odoms had identified two of the jackets that contained narcotics as belonging to the defendant. He argues that the evidence does not constitute an exception to the hearsay rule, and that the error was not harmless.
The State first alleges that the testimony is admissible under the "excited utterance" exception to the hearsay rule. LSA-C.E. art. 803(2). The State further argues that the evidence was admissible by the agent to explain the sequence of events. Finally, the State alleges that, even if admitted improperly, the admissibility of the evidence was harmless error.
Prior to the beginning of the trial, the defendant presented the court with an oral motion wherein he sought a ruling to exclude testimony regarding certain unspecified statements made by the defendant's mother on the basis that it was hearsay. The court deferred ruling on the motion until such time as the testimony was elicited during trial. During the trial, the defendant did not re-urge the objection or move to strike the testimony before the testimony was presented.
At the time that Agent Reyes testified regarding Ms. Odoms' identification of the locked bedroom as belonging to her sons, James and Alonzo, the following sequence is reflected in the record:
PROSECUTOR:
And you gain entry into the bedroom and there's a deadbolt lock on the closet?
AGENT REYES:
Right.
PROSECUTOR:
Is this significant to you?
AGENT REYES:
Yes, it is.
PROSECUTOR:
In what sense?
AGENT REYES:
It's rather odd, you're going to someone's house and they have doors locked for, I mean, no apparent reason. And at the time I asked Ms. Odoms whose room it was and she explained to me the room belonged to her son.
PROSECUTOR:
She said her sons?
AGENT REYES:
Sons.
PROSECUTOR:
Okay. And did you learn who her sons were?
AGENT REYES:
Yes, I did. At that time I already knew who James Odoms was, and at that time I learned she had another son named Alonzo Odoms.
PROSECUTOR:
Okay. And when did she tell you this?
AGENT REYES:
While she was
DEFENSE COUNSEL:
Objection, Judge. This is hearsay.
PROSECUTOR:
Judge, this is ait's already in evidence, Judge.
THE COURT:
You can go on.
AGENT REYES:
While she was seated in the front, her kitchen room, in the presence of Agent Pacaccio, she explained to me that her sons, James and Alonzo, used that room. It was their room. They keep some clothes in the room, and every once in a *229 while they stay over at the house in that room.
(Emphasis added).
The transcript of this questioning indicates that by the time the defendant lodged his objection to the testimony during trial, the jury had already heard the evidence that the room belonged to her sons, and any further explanation was merely cumulative of the prior testimony of this witness. Under these circumstances, the admission of such statement is harmless. State v. Hester, 99-426 (La. App. 5 Cir. 9/28/99), 746 So.2d 95, 107, writ denied, State v. Patterson, 99-3217 (La.4/20/00), 760 So.2d 342.
The defendant also contends that the trial court erred in allowing Agent Reyes to testify to what Ms. Odoms told him concerning the ownership of the jackets, which contained some of the narcotics. The defendant alleges that the testimony was inadmissible hearsay that prejudiced the outcome of the case. In particular, he alleges that the statements do not constitute an "excited utterance." He reasons that the response by Ms. Odoms in identifying the jackets as belonging to her sons was the result of reflective thought, during a session of interrogation, wherein she had been advised of her rights and informed that she could be arrested.
During the direct examination of Agent Reyes, he was presented with one of the jackets seized in this case. He was able to identify it as one of the jackets found on the day of the search, and he testified that the jacket contained cocaine. He indicated that when he found the jackets, the occupants of the house were seated in the kitchen, and he brought the jackets to Agent Pacaccio, who was sitting at the kitchen table with Ms. Odoms, logging the paperwork.
When the prosecutor asked Agent Reyes if Ms. Odoms had indicated who owned the jacket, the defense objected to the question and a bench conference ensued as follows:
PROSECUTOR:
Judge, it'
DEFENSE:
Two things: That is absolutely not an excited utterance. She's sitting there in a controlled environment. He's questioning her.
THE COURT:
Well, we don't know how it came out yet.
PROSECUTOR:
Well, it's also part of the res gestae too,
DEFENSE:
Well, not
PROSECUTOR:
not only an excited utterance.
DEFENSE:
Well, she's not part of theshe's not charged with anything, right.
PROSECUTOR:
It doesn't matter. She doesn't have to be arrested.
DEFENSE:
Somebody executed a search warrant on her home. Busted down the door.
THE COURT:
I'm going to allow that.
(Emphasis added).
The trial resumed with the following:
PROSECUTOR:
Officer, when you showed the jacket to Agent Pacaccio, who was seated in the kitchen, at the kitchen table?
AGENT REYES:
Correct.
PROSECUTOR:

*230 Okay. Ms. Odoms was present?
AGENT REYES:
Yes, she was.
PROSECUTOR:
Okay. What diddid Ms. Odoms tell you who that jacket belonged to?
AGENT REYES:
At that time she statedshe identified the jacket as belonging to James Odoms.
Thereafter, at the trial, Agent Reyes identified a second jacket as being one seized from the closet. He testified that Ms. Odoms had identified the jacket as belonging to James Odoms. The defense objected to the agent's testimony, and the trial judge noted the defense objection.
On cross-examination, Agent Reyes was asked to explain the events surrounding Ms. Odoms' identification of the jackets and he made the following statement:
AGENT REYES:
Okay. I'll tell you again from the beginning. As soon as we secured Ms. Odoms and her daughter and the small child in the kitchen area, I explained to Ms. Odoms that we were here looking for her son, James Odoms. I showed her the search warrant and told her that James had been dealing quantities of narcotics, of cocaine, out of her residence, and that we were here only for James, and we knew she wasn't involved in this, and that we wanted to speak to James and did she know where he was.
PROSECUTOR:
Okay.
AGENT REYES:
Then, after locating the cocaine, after locating the cocaine, because we didn't know the cocaine was in the residence at the time, when I sat her down and told her these things. When we located the cocaine, I brought the jackets out with the cocaine in it, and showed it to Ms. Odoms and told her, "you know, Ms. Odoms, not that this is going to happen to you because I wouldn't do that to you, because I know you have no involvement in this; but your son has cocaine in your house, and by law, you could physically be arrested for this being in your residence."
Both Agent Reyes and Agent Pacaccio testified that Ms. Odoms was upset during the time of the entry and search. Agent Reyes gave the following testimony:
DEFENSE:
When you say "witnessed by" these folks; you don't mean to imply to the members of the jury that you sat down and took a formal statement?
AGENT REYES:
No, it was very general conversation. As a matter of fact, Ms. Odoms was extremely upset. She had no idea that her house was being used to facilitate drug transactions. When I showed her the cocaine, she became upset. She was startled. She was befuddled by the whole incident, and was really upset about what was occurring.
(Emphasis added).
DEFENSE:
Okay. And at what point did she become upset?
AGENT REYES:
She was upset as soon as we came through the door.
Agent Pacaccio was also questioned about Ms. Odoms' condition during cross-examination, and he indicated that she was upset that the police were in her house. He further stated that she was not crying, but was "just emotionally upset."
A trial judge's determination regarding relevancy and admissibility of evidence *231 will not be overturned on appeal absent a clear abuse of discretion. State v. Francis, 98-811 (La.App. 5 Cir. 1/26/99), 727 So.2d 1235, 1237, writ denied, 99-0671 (La.6/25/99), 746 So.2d 597.
Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted. LSA-C.E. art. 801 C. Hearsay evidence is not admissible except as otherwise specified in the Louisiana Code of Evidence or other legislation. LSA-C.E. art. 802. An "excited utterance" constitutes a recognized exception to the hearsay rule. LSA-C.E. art. 803(2). An "excited utterance" is defined as a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. LSA-C.E. art. 803(2).
In the case of State v. Hester, supra at 105-106, this Court discussed the "excited utterance" exception to the hearsay rule:
This exception requires an event sufficiently startling to render a declarant's normal reflective thought process inoperative. Further, the statement of the declarant must have been a spontaneous reaction to the event and not the result of reflective thought. State v. Rhodes, 29,207 (La.App. 2 Cir. 1/22/97), 688 So.2d 628, 634-635, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481.
In determining whether a statement was made under the stress of the startling event, the most important factor is time. Other factors include whether the statement is self-serving or in response to an inquiry, whether the statement is expanded beyond a description of events to include past or future facts, and whether the declarant performed tasks requiring reflective thought between the event and the statement. State v. Jasper, 28,187 (La.App. 2 Cir. 6/26/96), 677 So.2d 553, 563, writ denied, 97-0753 (La.9/26/97), 701 So.2d 980.
The defendant contends that Ms. Odoms' statement to Agent Reyes regarding ownership of the jackets was not admissible as an "excited utterance". He alleges that the statement was not an "excited utterance" because it was made under a controlled environment during which Ms. Odoms had been advised of her rights and was being interrogated by police. However, Agent Reyes, when questioned on this point, characterized the response differently. He specifically stated that, at the time of her response regarding the ownership of the jackets, Ms. Odoms was engaged in general conversation and she was not making a formal statement.
Additionally, the defendant suggests that Ms. Odoms' excited state occurred only because it was induced by the fact that Agent Reyes told her that she could be arrested. Agent Reyes, however, testified that Ms. Odoms was excited "as soon as we came through the door." According to Agent Reyes, Ms. Odoms was upset because she had no idea that her home was being used to facilitate drug transactions. The situation was also amplified when she saw the cocaine and the events unfolding that day. Agent Pacaccio corroborated Agent Reyes' testimony regarding Ms. Odoms' emotional state.
We find that Ms. Odoms' response, although made in answer to Officer Reyes' question to her regarding the ownership of the jackets, was an "excited utterance." That is, the response by Ms. Odoms that her sons owned the subject jackets was made in the midst of the events of the forced entry of police, the discovery that her house was being used for criminal activity, the discovery that her children were involved in criminal activity, and at a time when Ms. Odoms was under the *232 stress of these events. Therefore, we find that the trial judge correctly admitted the response as an "excited utterance," which is a recognized exception to the hearsay rule. LSA-C.E. art. 803(2). Accordingly, the testimony in question was properly admitted, and this assignment of error is without merit.
In his second assignment of error, the defendant contends that the trial court erred in allowing evidence of other crimes to be admitted. He asserts that certain testimony by Agent Reyes and closing statements by the State constitute impermissible reference to "other crimes" evidence in derogation of LSA-C.E. art. 404 B(1). He also alleges that this evidence was not part of the "res gestae" and, therefore, the State was required to give notice and establish the admissibility of the evidence prior to trial. State v. Prieur, 277 So.2d 126, 130 (La.1973).
The State counters that the defendant failed to preserve the objection for review on appeal, since any objections lodged concerning this evidence did not give as its basis that the evidence constituted "other crimes" evidence. The State also argues that the evidence was that of the investigating officer and of the steps taken in securing the search warrant and arrest of the defendant. As such, the evidence was admissible as part of the "res gestae" and did not require prior notice. Finally, the State argues that if the admission of the evidence was error, it was nonetheless harmless.
The record reveals the following evidence leading to the testimony to which the defendant objected:
Agent Reyes, the chief investigator in this case, testified to the facts that led to the securing of a search warrant and subsequent arrest of the defendant. He stated that he and his partner set up a surveillance of the defendant's residence on Paine Street because they had received a tip from a confidential informant. Agent Reyes indicated that during the surveillance, the officer observed people, including the defendant, come to the residence, stay a short time, and leave. During this testimony of the agent concerning the people traffic in the area, defense counsel objected to the State's question of what the traffic indicated. The grounds stated were that the witness was not an expert. The judge sustained the objection of the defendant.
The agents secured a search warrant, and it was executed at the residence on March 24, 1999. Agent Reyes stated that upon entering the residence, he found Ms. Odoms, her daughter and her grandchild at home. In explaining his entry into her residence, Agent Reyes showed Ms. Odoms the search warrant and "informed her that her son James was selling narcotics out of her residence." Thereafter, the defense stated "Objection." No grounds for the objection were stated. The court did not rule on the objection, the defendant did not further pursue the objection, and the State continued with its questioning.
In the closing argument by the State, the prosecutor specifically stated that the defendant was not charged with "distribution." He further stated that the defendant was charged with "possession." He also stated that the defendant has a "sweet little operation." The defendant lodged no objection to the prosecutor's statement in closing argument.
In this case, the defendant's first objection was that Agent Reyes was not an expert and could not testify as to what the traffic in the area indicated. This objection was sustained by the trial judge and therefore presents nothing for review.
*233 At the time of the second objection, the defendant neither advised the court of the action he desired the court to take, nor stated a specific ground for the objection. Additionally, the defendant did not seek a ruling from the trial court.
LSA-C.Cr.P. art. 841 sets forth the manner in which an error is preserved for review on appeal. It provides, in pertinent part, as follows:
A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor. (Emphasis added).
Additionally, LSA-C.E. art. 103, provides, in pertinent part, as follows:
(A.) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(1) Ruling admitting evidence. When the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection; (Emphasis, in text, added).
This Court has previously recognized that the contemporaneous objection rule of LSA-C.Cr.P. art. 841 is applicable to evidence of "other crimes." State v. Hernandez, 98-448 (La.App. 5 Cir. 5/19/99), 735 So.2d 888, 899, writ denied, 99-1688 (La.11/12/99), 750 So.2d 194. In this instance, because the defendant did not state the grounds for his objection and did not seek a ruling from the trial court, the issue was not preserved for appeal. LSA-C.Cr.P. art. 841; LSA-C.E. art. 103. See State v. Styles, 96-897 (La.App. 5 Cir. 3/25/97), 692 So.2d 1222, 1227-1228, writ denied, 97-1069 (La.10/13/97), 703 So.2d 609. Likewise, the comments made the prosecutor during his closing argument were not objected to at trial and, therefore, any issue with regard to these comments was not preserved for appeal. Accordingly, the defendant's second assignment of error is without merit.
In his third assignment of error, the defendant asserts that the trial court erred in denying his Batson objections to two peremptory challenges exercised by the State. Although he initially complains in his brief of two challenges exercised by the State, he refers in his argument to three peremptory challenges exercised by the State as being racially motivated. Accordingly, this discussion will encompass all three challenges.
The defendant, who is a black male, contends that the State's peremptory challenges of three black potential jurors violated his constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution. In particular, he alleges that the State failed to give specific and articulable facts to support racially neutral reasons for the challenges.
The right to a trial by jury in criminal cases is such a fundamental feature of the American justice system that it is protected against state action by the Due Process Clause of the Fourteenth Amendment. Batson v. Kentucky, 476 U.S. 79, 87, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69, 81 (1986). A defendant does not have a right to a petit jury composed in whole or in part of persons of his own race; however, he does have the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria. Batson v. Kentucky, 476 U.S. at *234 86, 106 S.Ct. 1712. The Equal Protection Clause forbids a prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable to impartially consider the State's case against a black defendant. Batson v. Kentucky, 476 U.S. at 89, 106 S.Ct. 1712.
In this case, the racial composition of the general venire is unknown from the record. Likewise, the record does not clearly establish the racial composition of the petit jury in this case. The three potential jurors to which the defendant refers on appeal are: Ms. Jones (# 342), Mr. McGee (# 437) and Ms. Smith (# 619).
After securing basic background information from these three potential jurors, the State inquired whether any of the potential jurors had a family member or someone close to them that either had a drug problem or was in jail for drugs.
Ms. Jones responded that her sister and her nephew have drug problems and that her nephew went to jail for two years for a drug offense. Upon further questioning by the State, she indicated that this could possibly affect her decision in this case. She stated that because of this fact she would "lean" towards the defendant in making a decision.
Mr. McGee stated that his brother has a drug problem and his brother-in-law went to boot camp for three years as a result of a drug possession conviction. He stated that he would not have a problem serving on the jury in this case. Upon questioning by the defense, Mr. McGee stated that his brother-in-law went to trial and he could not say that the brother-in-law was wrongly convicted. Mr. McGee again stated that he did not have a problem serving on this jury and felt he could be a good juror. He also stated that if convinced of his position, he would adhere to his convictions.
Ms. Smith stated that her nephew was on drugs and served two years in jail. She further stated that she was not sure that she could sit on this type of case.
Thereafter, the State thanked and excused Ms. Jones, using a peremptory challenge. The defendant raised an objection under Batson v. Kentucky, supra. In response, the State said that Ms. Jones' nephew was in jail and she stated that she could not sit on this case. The State said that it was going to exclude any potential juror who had a problem with drugs in their family. The State gave the following additional race-neutral explanation for the exclusions:
PROSECUTOR:
And anyand Judge, anybody in my opinion, that has had family members or that are on narcotics or whatever, are not good jurors in this situation because they tend to lean one way or the other and that's not why we have jury selection. We want fair and impartial jurors. And that's the basis for my cuts on people like that, and it doesn't matter what race a person is.
I want people that are going to judge the facts, not judge what's happened in their past or present or whether somebody has a drug problem.
Thereafter, the trial court denied the defendant's challenge and noted his objection.
The State next exercised a peremptory challenge against Mr. McGee, and the defendant posed a Batson objection. The State gave the following explanation:
PROSECUTOR:
The same thing. Every person that has had this problem, I've excused. I'm going to do that based on what I know. And a person that has this in their past, I don't know whether they're going to hold it against me or whether they're *235 going to hold it against the defense. A person can say one thing and do another. I'm just playing it safe. I'm playing it fair. And I'm cutting someone based on what's happened in their past.
Thereafter, the trial judge denied the defendant's Batson challenge and noted his objection.
Finally, the State excused Ms. Smith with the exercise of a peremptory challenge. Again, the defense objected on the basis of Batson. The State gave the following reason for exercising the challenge:
PROSECUTOR:
The same reasons, Your Honor. She has a nephew that spent two years in jail. She told me that she couldn't be sure that she could be fair and sit on this case when I asked her the questions, so.
The trial court thereafter denied the defendant's challenge and noted an objection to the ruling. Following this ruling, the State exercised a peremptory challenge against a white female because her ex-husband had a drug problem.
The record reveals that after each of the defendant's Batson challenges, the trial court did not rule on whether the defendant had met his burden to establish a prima facie case of racial discrimination. In State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 288, writ denied (La.8/24/01), 795 So.2d 339, the Louisiana Supreme Court stated the following:
We agree with the court of appeal that a trial judge's demand that a prosecutor justify his use of peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory purpose. In any case, once the prosecutor has offered a race neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot. (Citations omitted).
Under these circumstances, we look to the State's explanation for each challenge. In each instance, the State explained that the challenge was being exercised because the juror in question had a close relative with a drug problem who had been convicted for a drug related offense, and the State felt under these circumstances that they could not be objective in evaluating the facts of this case. The fact that a family member is a convicted criminal is recognized as a racially neutral reason for excluding a prospective juror. State v. Jacobs, 99-0991 (La.5/15/01), 803 So.2d 933, 939-40, reh'g denied, 99-0991 (La.7/16/01), 803 So.2d at 958, cert. denied, ___ U.S. ___, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002) (citing State v. Lindsey, 543 So.2d 886 (La.1989)).
The State provided valid race-neutral reasons for challenging Ms. Jones, Mr. McGee, and Ms. Smith. It is apparent that the trial judge weighed the defendant's Batson challenges against the State's race-neutral reasons for excluding these potential jurors and concluded that the peremptory challenges exercised by the State were not motivated by race. We find that the trial court properly denied the defendant's Batson challenges. Accordingly, this assignment of error is without merit.
In his fourth assignment of error, the defendant contends that the trial court erred in failing to sentence the defendant under the newly revised Habitual Offender Law. However, in his brief, the defendant specifically states that this argument is abandoned on appeal. Therefore, we need not address the merits of this issue.

*236 ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals one patent error in this case.
The record does not indicate that the defendant took part in an arraignment regarding the allegations of the multiple bill. The right was waived, however, when defendant did not lodge an objection on this basis prior to the hearing on the multiple bill. LSA-C.Cr.P. art. 555. State v. Richmond, 98-1015 (La.App. 5 Cir. 3/10/99), 734 So.2d 33, 39.
For the reasons set forth above, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] The defendant's motion for appeal was premature when it was filed after conviction and sentence but before sentencing as a multiple offender. However, this procedural defect was cured by the subsequent re-sentencing. State v. Monroe, 00-1354 (La.App. 5 Cir. 3/28/01), 784 So.2d 29, 32.
[2] There are spelling discrepancies in the record. For consistency, the name will be spelled "Reyes" throughout this opinion.
[3] Agent Reyes had seen a photograph of James Odoms prior to beginning the surveillance.