811 So.2d 1033 (2002)
STATE of Louisiana
v.
Chester F. ONEZIME.
No. 01-KA-1018.
Court of Appeal of Louisiana, Fifth Circuit.
February 26, 2002.
*1035 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Brad Burget, Assistant District Attorneys, Gretna, LA, for State of Louisiana, Plaintiff-Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, for Chester Onezime, Defendant-Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD and WALTER J. ROTHSCHILD.
ROTHSCHILD, Judge.
On February 17, 2000, a grand jury indicted defendant, Chester Onezime, with the December 22, 1999 second degree murder of Jonita Sartin. LSA-R.S. 14:30.1. On February 22, 2000, defendant was arraigned and entered a not guilty plea. On March 2, 2000, defendant filed numerous pre-trial motions, including a motion to suppress statements. On April 6, 2000, defendant moved for the appointment of a sanity commission. A sanity hearing was held on June 1, 2000, and the defendant was found competent to stand trial. The court held a hearing on the defendant's motion to suppress statements on July 14, 2000, and after the hearing, the court denied the motion.
The trial was held before a 12-person jury on February 5-7, 2001. The jury returned a unanimous verdict of guilty as charged.
On February 23, 2001, defendant filed a Motion for New Trial, which was heard the same date and denied by the court. Thereafter, on that date, the State offered a victim's impact statement by the victim's mother. The defendant waived delays and sentencing occurred on that day, with the court imposing the sentence of life imprisonment at hard labor without benefits of parole, probation or suspension of sentence. Immediately following sentencing, the defendant made an oral motion for appeal that was granted by the court. Thereafter, a written motion for appeal was filed in the record. Defendant asserts two assignments of error on appeal. For the reasons stated, we affirm.

FACTS
On December 22, 1999, at approximately 2:30 a.m., Melissa Canessa called 911 to report a disturbance, an argument between a male and female in Apartment 15, which was the apartment adjacent to her apartment in the complex located at 1635 Newport Street in Kenner. Sergeant Buddy Hortle of the Kenner Police was in charge of the 911 calls and a dispatch was issued for an investigation.
Officer Robert McGraw of the Kenner Police Patrol Division was on duty with Officer Shane Tilfer of the Kenner Police Criminal Investigation Division, and they received the dispatch call. Upon arriving at the apartment complex, Officer McGraw knocked on the door of Apartment 15 and identified himself. The door was locked *1036 and he heard a male voice respond "Hold on," followed by the sound of running. Officer McGraw approached the front of the subject apartment, and Officer Tilfer went to the rear of the apartment.
Officer Tilfer first observed a car parked in the lot adjacent to the apartment with a black male in the driver's seat, who was later identified as Kevin Macraig, and a black female in the passenger's seat, who was later identified as Samara Gilton. Officer Tilfer asked the couple why they were there and Ms. Gilton responded that they were there to see a friend. At the time of the interview, Officer Tilfer did not see blood on either of these individuals. Officer Tilfer was watching the rear of the apartment complex, while interrogating the couple in the car. At about the same time, Officer Tilfer heard a noise and observed a black male in dark clothing jump out of the second-floor window of one of the apartments. Officer Tilfer told the couple in the car to leave and they drove to a nearby location, where they were able to observe what transpired. Macraig and Gilton remained in that location where they observed additional police arrive at the scene, the arrival of an EMS unit, and the crime lab that roped off the area with yellow tape. The police were also seen as they escorted Onezime in handcuffs to the police car. Thereafter, Macraig and Gilton returned to Macraig's apartment and, according to Macraig, he allowed Gilton to stay in his car overnight because Onezime had the key to the couples' apartment.
After hearing the noise and seeing the suspect jump from the apartment window, Officer Tilfer proceeded to a patio area adjacent to the complex. Officer Tilfer heard a second loud noise like the breaking of glass and he summoned Officer McGraw to help surround the suspect. Officer Tilfer was watching the apartment, heard another noise to his right and thereafter saw the same suspect pass in front of him. Officer McGraw apprehended the suspect, later identified as Chester Onezime. Onezime was covered in blood, with blood on his hands, arms and clothing. Onezime was arrested. After being handcuffed, a pat-down of the suspect by Officer Tilfer revealed a bloodied "lock-blade" knife in his rear pocket. The knife was removed and turned over for evidence. According to Officer Tilfer, at the time of the discovery of the knife, Onezime stated, "I didn't kill her. I just held her down. The other guy did it."
Thereafter, Officer Tilfer notified Officer McGraw of his discovery and requested that McGraw summons their supervisor, Sergeant Richard Montley, to the scene.
Officer Darrell Cromley of the Kenner Police had arrived at the scene and transported Onezime away from the scene. The suspect was taken to police headquarters where, in conjunction with his booking, his clothes were removed for evidence and he was photographed.
Shortly thereafter, Sergeant Montley arrived at the scene and was advised of the events that transpired before his arrival, including the fact that the officers had knocked on the front door of Apartment 15, but got no response. Based upon the information provided, Sergeant Montley authorized the forceful entry into the subject apartment. The door was difficult to kick open and upon entry it was discovered that the dead-bolt was still engaged.
Upon entry into the apartment the officers discovered the body of a black female victim lying on the floor in a pool of blood, with her feet located near the front door. She was later identified as Jonita Sortin. There was a small child sitting on the sofa, who was later identified as the victim's son. Upon seeing the police, the child said, "That boy killed my momma." The child was removed from the apartment and placed with neighbors during the investigation. *1037 Detective Brian McGregor of the Kenner Police Department was assigned to interview the child. The child informed McGregor that a man had choked his mother and then "stuck" her.
After entry into the subject apartment, Officers McGraw and Tilfer searched the apartment for additional suspects but found none. The EMS unit was summoned and arrived within minutes. The victim was pronounced dead at the scene. An autopsy revealed that the victim sustained two stab wounds to the chest, one on the right and one on the left from a sharp instrument, and the wounds were compatible with ones that could result from a knife. The stab wound to the right chest severed the pulmonary artery, which caused the victim to "bleed-out" within approximately 15 minutes and was the cause of death. In addition to these major wounds, the victim also sustained cuts of the right neck, left hand and arm, as well as abrasions of the neck, back of the left arm and thumb.
Officer Tilfer was stationed at the front door of the victim's apartment to protect the crime scene. Detective McGregor requested the crime scene unit. Detective Mike Jackson of the Kenner Police was in charge of the investigation. A review of the crime scene by Detective Jackson revealed the victim on the floor just past the entry door and blood on a sofa located nearby. There was blood discovered in the kitchen, on the wall in that area of the glass door, on the blinds over the back door, and on a blind cord in the upstairs bedroom. The handle to the glass door in the kitchen had fallen off and was on the floor, such that the door could not be easily opened.
The glass door in the rear of the adjacent apartment, Apartment "O," was shattered. There was blood on the interior stairwell and wall of Apartment "O." There was also blood on the gutter of that apartment.
On the outside of the victim's apartment, there was a broken fence board. In the patio area of victim's apartment, a bloodstained glove was found and a second blood-stained glove was also discovered outside the adjacent apartment, Apartment "O." It was later determined that these gloves belonged to Onezime. A hat that belonged to Onezime was also discovered in the yard area.
The victim's car was located in the parking lot and found to have had its tires slashed.
Officer William Scalfani was the crime lab technician for the Kenner Police Department who photographed the scene and collected evidence. The evidence containing blood was turned over to the lab for analysis. Subsequently, blood samples were taken from the victim and from the defendant and it was discovered that the victim's blood-type was "A" and the defendant's was "B." Of the evidence collected at the scene and from Onezime, subsequent lab analysis indicated that the blood found on the defendant's clothing, the knife, and the gloves were blood-type "A." Although samples from the apartment tested positive for blood, the blood-type could not be ascertained.
While Detective Jackson was at the victim's apartment, a phone call was received from a boyfriend of the victim, David West. Detective Jackson arranged to interview West. On that afternoon, David West appeared at Police Headquarters to give a statement. He waived his rights, and consented to allow himself to be photographed and to give a statement about his actions on the night of the murder. West told Detective Jackson that he was the victim's boyfriend and that they had dated since September 1998. According to West, he spoke to the victim between the hours of *1038 12 and 1 in the morning, on the night of her murder. At the time of the murder, David West was at his apartment at 3201 Rue Park Fontaine, Apartment 2507, in New Orleans, with his 20-month-old son and his live-in girlfriend, Venita Spears.
West told Detective Jackson of an unusual phone call he received on the night of this incident, at approximately 2:00 a.m. The caller was a female who identified herself as "Kim" and she said she knew West, but when he attempted to find out who she was she hung up on him.
West told Detective Jackson that he and Onezime had worked together and lived together for a couple of months in Leesville. During that time, the victim visited West and Onezime's girlfriend, Samara Gilton, visited Onezime. West had an argument with Onezime on Thanksgiving because Onezime had told the victim that West was cheating on her. The two men had not communicated since that time.
Following the statement, David West consented to a search of his residence and vehicle. No evidence was recovered.
The events immediately preceding the murder, as relayed by the three witnesses at the scene (i.e., Onezime, Gilton, and Macraig) are in conflict. Onezime gave three statements to police concerning the events. Two statements were given on the date of his arrest and a third statement was given on March 14, 2000.
The defendant's first statement was given to Officer Brian McGregor after Onezime was explained his constitutional rights and waived same.
In the first statement, Onezime stated that, on the night in question, he had met the victim's boyfriend, David West, on the Westbank at the Aurora Theater. According to Onezime, the two men went to the victim's apartment, where Onezime waited in the car, while West went into the apartment. Thereafter, Onezime went to the door of the apartment, knocked on the door and was admitted. Onezime said that the victim and West were arguing. According to Onezime, he went upstairs to put the victim's baby to bed and, when he returned, the victim was on the floor and bleeding. Onezime could see that West was holding a knife, which West later dropped to the floor. A knock was heard at the door and Onezime picked up the knife. The door was locked and West could not open it, so the two men ran upstairs into a bedroom, where they each jumped from the bedroom window. According to Onezime, the blood on his person and clothing was a result of coming into contact with David West and from touching the stairwell handrail. Onezime denied harming or stabbing the victim. At trial, defendant admitted that nothing in his first statement was true.
Confronted by detectives with inconsistencies in his first statement, defendant agreed to give a second statement. On the afternoon of December 22, 1999, at approximately 3:00 p.m., the defendant met with Officer McGregor and lead Detective Jackson. He was read his rights and waived them before giving a second statement. Onezime stated that on the night in question he caught a bus from General DeGaulle on the Westbank to the victim's apartment. He stopped at a local Winn Dixie and called David West, at West's house, to ascertain his whereabouts. The defendant identified himself as "Kim." Thereafter, the defendant proceeded to the victim's apartment complex. According to Onezime, he was angry because he believed the victim had falsely told David West that she was pregnant by West. Once inside the apartment, the defendant and the victim argued. According to the defendant, he lost his temper, slapped and pushed the victim. When Onezime thought that the victim was going to throw something at him, he stabbed her two *1039 times. Onezime tried to leave the apartment by the back door but he could not open it, so he ran upstairs and jumped out the window. The defendant went over the fence, broke a glass door, and entered an adjacent apartment, before being caught by police. Onezime admitted that the knife, gloves and hat found by police belonged to him.
On March 14, 2000, the defendant was in jail and telephoned Detective Jackson and left a message that he wanted to talk to him. Jackson went to the jail to speak with the defendant. Before the defendant gave the third statement, Jackson ascertained whether Onezime remembered being given his rights on the two prior occasions and whether he understood them, to which Onezime responded that he did. Jackson indicated that of his own free will the defendant wanted to make a third statement. Onezime stated that, on the night in question, he, his girlfriend, Ms. Gilton, and a male friend, Kevin Macraig, were going to the victim's house in order to engage in group sex. They went together in Macraig's car to the victim's apartment. When they arrived, there was a car that appeared to belong to David West, so they drove to Winn Dixie to call West to see if he was home. After ascertaining that West was home, the three returned to the victim's apartment. Ms. Gilton got out the car and went to the victim's apartment, was admitted and returned in about 10-20 minutes. According to Onezime, when Ms. Gilton returned to the car she indicated that she wanted to leave. When Gilton would not tell Onezime what happened, Onezime left the car for the apartment. Upon entering the apartment, he found the victim slumped over on the sofa. Onezime indicated that he pressed his hand on the victim's chest in an attempt to stop the bleeding and, at that time, the victim's child came down the stairs. Shortly thereafter, the police knocked at the door. Onezime recognized the knife on the floor as his. He picked the knife up from the floor, panicked, ran and jumped out the window. In the statement, Onezime indicated he had been having an affair with the victim for a long time and Ms. Gilton did not know about this but she later found out. He also indicated that during that night that Kevin Macraig never left the car.
In her first statement to police given January 6, 2000, Ms. Gilton, the defendant's girlfriend, indicated that, on the night in question, she did not leave her house but that the defendant did come over and did not tell her when he left. At trial she admitted that this statement was false. Following this first statement, the interviewing officer advised Ms. Gilton that she was a suspect in the victim's murder. He then advised her of her rights, which she waived. The officer asked if she had made the phone call to David West on the night of the murder and admitted she did. Ms. Gilton then indicated that she wanted to give a second statement.
On the same day, January 6, 2000, Ms. Gilton gave a second statement. She stated that on the date in question the defendant came to her house with an unknown male friend and told her to get dressed because they were going for a ride. Gilton said that they drove to Kenner and she guessed they were going to see the victim. She assumed they were going to the victim's apartment so that Gilton could talk to her about a job. Before stopping at the victim's apartment, the trio went to a supermarket pay phone where the defendant dialed David West and put Gilton on the phone and she identified herself as someone else. The trio then proceeded to the victim's apartment and once there, the defendant instructed her and the driver to remain in the car while he went to the victim's apartment. After about 15 minutes, *1040 when the defendant did not return, Gilton left the car and walked to the apartment. Gilton was admitted to the apartment and held a conversation with the victim. Thereafter, the defendant told Gilton to return to the car, which she did. After waiting 20 minutes for the defendant to return to the car, Gilton left the car and was headed back to the apartment and, on her way, she spotted the police. Gilton returned to the car and she and Macraig were approached by the policeman. They were asked why they were at this location, and thereafter they were instructed to leave. Ms. Gilton said they watched from a distance until the police took the defendant away. She denied knowing the knife belonged to the defendant. She said that she did not know whether the defendant punctured the victim's tires. She also denied having had sexual relations with the victim.
At trial, Gilton testified that, on the night in question, she took a ride with Macraig and the defendant to the victim's apartment. They left the apartment and went to make a call to the victim's boyfriend, David West. The call was made and a false name was given to West. Ms. Gilton testified that they returned to the apartment. Gilton and the defendant left Macraig's car and went to the apartment. Gilton was admitted to the apartment and according to her, the victim revealed that she and the defendant were having an affair. Gilton told the victim she was leaving the defendant, and, according to Gilton, there was no argument and the victim was trying to be "helpful." According to Gilton, the defendant then entered the apartment without knocking and she left to sit in the car. She then left the car and headed back to the apartment when she encountered the police. She returned to the car, was questioned by police, and left the scene. She and Macraig drove to a nearby location where they observed the police apprehend the defendant and rope off the area with a yellow tape.
Kevin Macraig gave his version of the events of December 22, 1999 at trial. He testified that, on the night in question, he had talked to the defendant about giving him a ride to pick up a woman to bring to his apartment. They were going to engage in group sex. Macraig went to the defendant's apartment at about midnight and retrieved the defendant and his girlfriend, Ms. Gilton. They got in the car and drove to Kenner. When they arrived at the complex where the victim lived, they searched for her car to see if she was there and then the defendant knocked on her door but got no answer. They drove to Winn Dixie to use the phone. The defendant and his girlfriend left the car and used the phone. Macraig stated that he did not know whom they had called. The three then returned to the victim's apartment complex. Ms. Gilton left the car and went to the apartment of the victim, but did not see the victim. The defendant, who had been in the car with Macraig, left to see where Ms. Gilton was. In the interim, Ms. Gilton returned to the car and was looking for the defendant. Thereafter, Ms. Gilton got out of the car with Macraig to look for the defendant. At that time the police arrived and Ms. Gilton told Macraig they should get back in the car, which they did. Gilton and Macraig were questioned by police before they were instructed to leave the scene. They relocated to a location nearby, where they could observe the events that transpired. From that point, Macraig stated that he saw more police and an ambulance arrive. According to Macraig, when they saw the area roped off in yellow tape, Ms. Gilton stated she hoped "her baby [the defendant] was not in trouble." Thereafter, Macraig drove home with Gilton in the car.

*1041 DISCUSSION

The defendant contends by assignment of error number one that the trial court erred in denying the defendant's motion to suppress the third statement that he gave to police. Defendant reasons he was represented by counsel at the time and the State did not show that he voluntarily waived right to counsel at the time of the third statement.
The State counters that the defendant was fully aware of his constitutional rights, including the right to counsel, and he chose to waive that right when he approached the police and voluntarily made the third statement.
At the hearing on the motion to suppress the statements, Detectives Brian McGregor and Michael Jackson testified.
Detective McGregor testified that, on December 22, 1999, he took two statements from the defendant. The first statement was taken at 5:30 a.m. At that time, the officer read the defendant the Advice of Rights form, wherein he was advised of his rights, including the right to counsel. The defendant signed the form and waived his rights. In the form defendant indicated that he had a twelfth-grade education and that he could read and write. An audio taped statement was taken and, on the tape, defendant was advised of his rights and waived the same.
The second statement was given to Detective McGregor in the presence of Detective Jackson. Again, the defendant was read his rights before and during the audiotape. The defendant indicated he wanted to give a statement.
According to Detective McGregor, at no time during the interrogation did the defendant indicate that he wanted to stop or that he wanted an attorney. He likewise never indicated that he did not understand his rights.
Detective Michael Jackson identified the Advise of Rights form used for the second statement. Detective Jackson stated that he read the form to the defendant at the time of the second statement. According to this witness, the defendant was not promised anything for his statement nor was he threatened or coerced. He further stated that the defendant could read and write and had a twelfth-grade education. The defendant waived his rights, including the right to counsel. At no time did the defendant indicate that he wanted to stop his statement.
With regard to the third statement given by the defendant, Detective Jackson testified that it was given on March 14, 2000 at the Correctional Center. The defendant had contacted Detective Jackson by telephone and left a message that he wanted to talk to him. When the two men met, Detective Jackson asked the defendant if he understood his rights, as he was twice previously advised; and the defendant responded that he did. Detective Jackson asked the defendant if he wanted to waive those rights and the defendant indicated that he did. It was Detective Jackson's opinion that the defendant understood the rights he waived. Detective Jackson stated that the defendant was not promised anything nor threatened. According to Detective Jackson, the defendant never asked to stop the statement, nor did he request an attorney. Detective Jackson stated that he did not specifically advise the defendant again of his right to remain silent and his right to counsel, but the defendant indicated he remembered the rights previously given to him.
At the conclusion of the hearing on the motion to suppress, defense counsel argued with regard to the third statement, that the questioning by Officer Jackson was not sufficient for Miranda, in that he merely alluded to constitutional rights that *1042 had been described to the defendant three months earlier. Additionally he argued that, as defendant's counsel, he should have been notified of the interrogation, especially because the defendant was not reminded that he had the right to counsel at the time of the statement.
The State argued that the defendant was given his constitutional rights and waived them without duress or promises. The defendant could read and write and had a twelfth-grade education so the waiver was knowing. With regard to the third statement, the State argued that the defendant could waive counsel even after the attorney was on the case. Thus, the State argued that all three statements were admissible.
The trial court denied the motion to suppress the statements. The court gave the following reasons:
THE COURT:
All right. The first two statements, I find there was no coercion. It's obvious the defendant was advised of his rights. Those are the easiest ones to deal with, that's why I'm dealing with those first.
That I find there was no improper action; that the defendant was advised of his rights and that they are admissible. The State has carried the burden to show they're admissible. Defense has not shown that they were unconstitutionally obtained.
The third statement presents us with a whole new set of problems. After reading the case law, I believe that the bigger issues [sic] is not whetheradvise of counsel, but whether or not a waiver of rights under Miranda wasis sufficiently present in that case.
The case law that I think is applicable talks about a number of factors to be considered. One of the big factors is who initiates the subsequent questioning.
This was more so than just while you're still there in their presence; this is a thought out process of many months later, while you actually go to thethe defendant actually went to the trouble of making a phone call and leaving a message on a tape for the officer to come to the facility where defendant was to talk to him.
I don't think there's any doubt, based on what I've seen, that there was not actually reiteration of all the Miranda warnings. I don't think anybody can contend that the officer said he didn't do that.
However, I believe that the reference to all of the constitutional rights you had back then: `Do you remember them? Do you still understand them?' `Yes Yes.' This was initiated totally 100 percent by the defendant, and going through extraordinary steps for someone already in jail to reach a police officer in a municipal jurisdiction far away to come and leave him a message for a detective.
So I believe, obviously, there was no coercion, no threats, that it does not violate his right of counsel, because all of the cases indicate that even though there is a right to counsel, if the defendant is the one who initiates the contact and is not asked by the police officer, then that isyou can look at all of the factors surrounding it as to whether or not it was voluntary and is a voluntary waiver. And, obviously, to me it is.
I believe that it's sufficientlythe totality of the circumstances indicate that it was voluntarily done by the defendant and that he did indicate that he understood all of his rights.
And I'm going to hold that the third statement also is admissible and not unconstitutionally obtained.
*1043 Thereafter the defendant objected to the court's ruling.
At trial, during the State's direct examination of the lead detective, Detective Jackson, reference was made to the events surrounding the defendant's third statement to police. Shortly thereafter, the State offered the tape and transcript of the defendant's third statement into evidence. The following discourse occurred at that time:
MR. BURGET [DISTRICT ATTORNEY]:
Your Honor, at this time the State would like to offer, file, and introduce into evidence State's Exhibit 124, the audio taped statement, and also State Exhibit 125 is the transcript of that statement for identification only.
THE COURT:
Any objection, counsel?
MR. MONTGOMERY [DEFENSE]:
No objection.
THE COURT:
Let 124 and 125 be admitted. 125 for record purposes only.
(TAPE PLAYED TO THE JURY).
(Emphasis Added).
Thereafter, the State continued its examination of Detective Jackson. Thereafter, the defense utilized the statement in the cross-examination of the officer. The statement was also used by the defense counsel in the direct examination of the defendant and by the State in its cross-examination of the defendant.
Generally, to preserve an issue for appeal, a party need not enter a contemporaneous objection to the court's ruling on a written motion. LSA-C.Cr.P. art. 841B. However, where a defendant initially files a pre-trial motion objecting to the introduction of certain evidence, if at trial he specifically agrees to the introduction, he has waived his prior objection and loses the right to present the issue on appeal. State v. Gaal, 01-376, p. 22 (La.App. 5 Cir. 10/17/01), 800 So.2d 938, See also: State v. Butler, 30,798 (La.App. 2 Cir. 6/24/98), 714 So.2d 877, 894, writ denied, 98-2217 (La.1999), 734 So.2d 1222; State v. Dillon, 93-707 (La.App. 5 Cir. 1/24/94), 631 So.2d 1171.
Accordingly, in this case where the defendant first noted his objection to the admissibility of the third statement by his written motion and his objection to the trial judge's ruling on the motion, but thereafter stated that he had no objection to its introduction at trial, he waived any right to raise issues on appeal concerning the admissibility of the challenged statement.
Nevertheless, in light of the constitutional issues raised herein, we have considered the merits of defendant's claims.
In order for an inculpatory statement to be admissible, the State must prove beyond a reasonable doubt that the defendant was advised of his Miranda rights and the statement was made freely and voluntarily. LSA-C.Cr.P. art. 703 D; LSA-R.S. 15:451; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Quest, 00-205 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, 780. The determination of voluntariness is made on a case-by-case basis and rests on the totality of the circumstances. State v. Quest, supra, at 780, 782. The trial judge's determination as to the admissibility of the statement is entitled to great weight and will not be overturned unless it is not supported by the evidence. State v. Taylor, 99-1154 (La.App. 5 Cir. 2/29/00), 757 So.2d 63, 67, writ denied, 00-1021 (La.3/30/01), 788 So.2d 441. In determining whether the trial court's ruling on a motion to suppress the evidence is correct, the appellate court is not limited to the *1044 evidence adduced at trial, but may also consider pertinent evidence presented at the trial. State v. Monroe, 00-1354 (La. App. 5 Cir. 3/28/01), 784 So.2d 29, 35.
In the case of State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367, 387, the Louisiana Supreme Court reached the following conclusion concerning the right to counsel during interrogations:
Once adversary judicial criminal proceedings have commenced against a defendant, he is entitled, by virtue of the Sixth Amendment and La. Const. Art. I, Sec. 13 to the assistance of counsel at all subsequent critical stages of the proceedings. Interrogation is a critical stage triggering this right. This means that the government is prohibited from deliberately eliciting statements from the defendant without an express knowing, intelligent and voluntary waiver by him of the right to counsel. This prohibition exists automatically and does not hinge on any assertion of right by the defendant. Under Michigan v. Jackson, (475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)) however, the Court presumed that `suspects who assert their right to counsel are unlikely to waive that voluntarily in subsequent interrogations.' Michigan v. Harvey, 494 U.S. at 350, 110 S.Ct. at 1180. This presumption led to the creation of a purely prophylactic, bright-line rule holding that waivers otherwise considered valid will be held invalid where they are made after defendant has asserted or invoked his right to counsel and makes a statement in response to police-initiated interrogation. Where defendant has not made an assertion or invocation of his previously attaching right to counsel, however, defendant is only entitled to the traditional right to counsel protection whereunder the state cannot deliberately elicit statements from him in the absence of counsel without an express waiver of the right to counsel. The State then has the burden of proving defendant's waiver was knowingly, intelligently and voluntarily made.
In this case, at the time of the third statement on March 14, 2000, the defendant had been indicted, arraigned and his attorney had filed pre-trial motions on his behalf. Thus, the defendant's right to counsel had attached under the state and federal constitutions. U.S. Const. amend. VI; La. Const., art. I, § 13; State v. Carter, supra; State v. Monroe, supra.
There is no dispute that defendant was entitled to counsel during a custodial interrogation. The defendant contends, however, that because counsel had already been appointed and had acted on behalf of the defendant, this entitled the defendant to the added protection afforded by the prophylactic rule of Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). Under these circumstances, defendant reasons that a presumption arose that defendant did not waive counsel.
This reasoning does not find support in the Jackson decision. In Jackson, 475 U.S. at 626, 106 S.Ct. at 1405, 89 L.Ed.2d at 636, the United States Supreme Court stated the holding of the case as follows:
We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid. (Emphasis Added).
In discussing this aspect of the Jackson rule, the Louisiana Supreme Court stated in State v. Carter, 664 So.2d at 380:
The fact of attachment of the Sixth Amendment right to counsel does not alone preclude the police from thereafter interrogating a defendant. Nor does *1045 the mere fact of appointment of counsel for an indigent defendant alone preclude subsequent interrogation. Had the United Supreme Court intended ... for the fact of appointment of counsel alone to be sufficient to preclude the police from thereafter interrogating defendant and obtaining a valid waiver, it could have so stated in Michigan v. Jackson.... Instead, the Court declined the opportunity to hinge its rule invalidating waivers obtained pursuant to police-initiated interrogations on the fact of the appointment of counsel itself and instead chose to invalidate only those waivers obtained pursuant to police-initiated interrogation occurring after the defendant has made `a request for counsel' or an `assertion... of his right to counsel.' (Emphasis Added; citations omitted).
In this case there has been no claim of such an assertion nor does the record support such a finding. Accordingly, under these circumstances, the prophylactic rule of Jackson does not apply. Thus, the State in cases such as this is required to prove that the defendant's waiver was knowing, intelligent and voluntary.
The State argues that since the defendant initiated this meeting with police that the waiver of rights was valid without any additional safeguards.
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court did recognize the fact that if the defendant had initiated the encounter with police, the constitution would not prevent the police from merely listening to the defendant's voluntary, volunteered statements and then using them against him at trial. Edwards, 451 U.S. at 485, 101 S.Ct. 1880. In Edwards, 451 U.S. at 486, fn. 9, 101 S.Ct. 1880, the Court added the following:
If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be `interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.
In the present case, although the defendant initiated the meeting, it clearly developed into an "interrogation" and, therefore, it was necessary for the State to show a valid waiver of rights.
The voluntariness of the statement is easily found, as there were no allegations of enticement or coercion. Detective Jackson, who took the third statement, testified without equivocation, that no promises, threats or coercion existed and that defendant was the one who initiated the third statement.
We turn next to the issue of whether the waiver was "knowing and intelligent." With regard to proving that a knowing and intelligent and voluntary waiver of counsel has been made, the court in State v. Carter, supra, made the following pronouncement:
To show a knowing and intelligent waiver of the right to counsel, the State must prove "an intentional relinquishment or abandonment of a known right or privilege." In other words, a defendant may waive his right to counsel "if he knows *1046 what he is doing and the choice is made with eyes open." A statement or confession is voluntary only if it was the product of defendant's uncoerced free will. The validity of a waiver is determined by careful scrutinizing the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. Although this court defers to the findings of the trial judge as to whether the confession was knowingly, intelligently and voluntarily made, a trial court's conclusions will not stand unless supported by adequate evidence. Courts should indulge in every reasonable presumption against waiver. (Citations omitted).
664 So.2d at 385; See also: State v. Monroe, supra.
At the time of both the first and second statement, there was a detailed review of each the rights the defendant was afforded and a specific waiver of each right, including the right to counsel, upon the execution of the Advisal of Rights form. At the hearing on the Motion to Suppress, Detective Jackson testified that he reminded the defendant of having twice been advised of his constitutional rights and the detective inquired whether defendant remembered and understood those rights, and the defendant indicated that he did. Thereafter, Detective Jackson asked the defendant if he waived those rights and the defendant said "yes." Detective Jackson testified that it was his opinion that the defendant understood the rights he waived and, additionally, the defendant did say he wanted to stop the statement nor did he at any time request an attorney. Detective Jackson admitted that he did not at that time specifically advise the defendant of his right to counsel nor the right against self-incrimination.
Under the factual situation presented here, we find that under the "totality of the circumstances" the defendant made a knowing and intelligent waiver of his constitutional rights, including his right to counsel. Although the rights were reviewed with him some three months before this statement, the record, nonetheless, indicates that the rights were reviewed with the defendant individually, on two separate occasions. Moreover, the record indicates that the defendant was not an uneducated man, having gone to school for 12 years. The defendant, at the time of the statement, said he remembered and understood his rights and at no time thereafter indicated by his words or actions that he wanted to stop the statement or seek assistance of his attorney. Therefore, under the totality of the circumstances, we find that the defendant's waiver of rights for purposes of his third statement was "knowing and intelligent."
Even assuming the admission of the statement was an error, which we find not to be the case, the error is subject to the harmless error analysis. State v. Monroe, 784 So.2d at 38. An error is harmless if it does not affect substantial rights of an accused. LSA-C.Cr.P. art. 921. Such errors are harmless if a guilty verdict was surely not attributable to the error. State v. Monroe, supra, at 38.
In this case, defendant was apprehended shortly after the murder when he was seen jumping from a window in the victim's apartment. At the time of the apprehension, he was covered in blood and the blood later was tested and proved to be the same blood type as that of the victim. The defendant was caught with the bloody murder weapon in his pocket. The only known witness to the crime, the *1047 victim's son said a man had stabbed his mother. In his second statement to police, which was not contested on appeal, the defendant admitted murdering the victim.
Under these circumstances, the evidence against the defendant was overwhelming and we fail to find that the admissibility of the third statement, which was only inculpatory, in that it placed him at the scene on the night of the murder, significantly contributed to the verdict in this case. For these reasons, the error if any, was harmless.
On the basis of defendant's second assignment of error, the record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors patent in this case.

DECREE
Accordingly, for the reasons assigned herein, the conviction and sentence of defendant, Chester F. Onezime, are affirmed.
AFFIRMED.