956 So.2d 626 (2007)
STATE of Louisiana
v.
William J. BATISTE.
No. 06-KA-824.
Court of Appeal of Louisiana, Fifth Circuit.
March 13, 2007.
*629 Paul D. Connick, Jr. District Attorney, Terry M. Boudreaux, Megan L. Gorman, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
William J. Batiste, Angola, Louisiana, Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and CLARENCE E. McMANUS.
CLARENCE E. McMANUS, JUDGE.
The defendant, William J. Baptiste, was charged with one count of second degree murder, a violation of LSA-R.S. 14:30.1. After a three-day trial before a twelve-person jury, the defendant was found guilty of manslaughter, a violation of LSA-R.S. 14:31. Thereafter, the trial court sentenced the defendant to 40 years at hard labor with credit for time served. Defendant now appeals from the conviction and sentence.
The following was produced at trial. Detective Eric Becnel of the Gretna Police Department testified that, on September 18, 2003, he responded to a homicide, at 1536 Stumpf Boulevard, in Gretna. The *630 victim, Bryant Sears[1], was found in front of his apartment between his car and a silver-colored van. As part of the investigation, the defendant's cousin, Shantell Rose, and her husband, Trevor Jones, were interviewed. They both provided information that led to the defendant as a suspect.
Based on the information provided by the witnesses, Detective Becnel obtained a warrant for the arrest of the defendant. According to Detective Becnel, the defendant was located and arrested by the Kenner Police Department where he signed a waiver of rights form. After being advised of his Miranda rights while being transported from the Kenner Police Department to the Gretna Police Department, the defendant admitted that he killed Sears. The defendant was again advised of his Miranda rights, upon his arrival at the Gretna Police Department. He waived his rights and agreed talk to the Gretna police before he gave two taped statements.[2]
Detective Becnel learned through his investigation that, on the night before the shooting, the defendant stayed at 728 Hinyub Street with Shantell, Jones, and Pamela Rose (defendant's aunt). Detective Becnel also learned that there had been a physical altercation between the defendant's mother, Phyllis Baptiste, and Sears earlier in the month of September. According to Detective Becnel, the defendant told him that after he shot Sears, he rolled him over on the ground, placed the barrel of the gun next to his ear, and shot him again. The first bullet entered near Sears' right eyebrow. The second bullet's entrance behind Sears' ear caused blackening of the skin, due to the placement of the barrel against the skin. According to Detective Becnel, eyewitness Clarence Anderson heard the two shots. Then, he saw an individual run around the van near Sears, and continue running until he dropped a wallet. Detective Becnel testified that the defendant later told him that it was Sears' wallet. The defendant continued running until he reached 728 Hinyub Street. After he obtained entry, Shantell asked him if he killed Sears, and he admitted that he had. The defendant disrobed, and then had Shantell dispose of his clothes. The defendant and Shantell went through the defendant's wallet, which contained $200.00. The defendant told Shantell to dispose of the wallet by throwing it over the rear fence, which she did.
Trevor Jones testified that the defendant told him on September 13, 2003, that he was tired of Sears abusing and beating the defendant. Sears was also still drinking and beating his mother. The defendant could not take it any more, and was going to take matters into his own hands and kill Sears. According to Jones, the defendant wanted to kill Sears because he was responsible for the defendant's brother's death, and the defendant felt that it was his responsibility to stop the abuse. The next day, September 14, 2003, the defendant returned to Jones' home with a book bag containing a gun and clothes. On the night before the shooting, the defendant stayed at the home of his aunt, Pamela Rose, with Jones and his wife. According to Jones, the defendant left the next morning, around 4:00 or 5:00 a.m., to kill Sears. When the defendant returned, he gave Jones a wallet that contained money.
At trial, the defendant described an incident in which Sears armed with a gun obtained entry to their home, and beat his mother. Sears was not prosecuted. The *631 defendant, his mother, and his brother went to California to get away from the defendant. The defendant and his brother complained of their abuse to school personnel. Sears denied the allegations, and the police did nothing about the complaint. The defendant's brother told a juvenile court judge that Sears was physically and mentally abusing him. However, nothing was done about the abuse. The defendant described several occasions when he and his brother were abused by Sears. He reported one incident of abuse to the California police. He received counseling, but Sears was not prosecuted. Besides the physical abuse, the defendant claimed he suffered daily mental abuse. On several occasions, the defendant was either forced to leave the home or left because of the abuse. The defendant also observed Sears physically abusing his mother on several occasions when he was young. He described an incident in which Sears was choking his mother as he lifted her in the air. When he and his brother cried and told Sears to stop hitting their mother, Sears started hitting them. He testified that he felt responsible for his brother's death because he missed the bus, and was not there to protect him. The defendant testified Sears physically abused his mother on several occasions after his brother's death. After one occasion, September 6, 2003, his mother asked him to come to her home. He knew she had tried to call the police. When the defendant saw her busted lip, he became enraged. He thought that his mother would be the next to be killed.
According to the defendant, from September 6, 2003 until the day he killed Sears, he was depressed and thinking of all the years of abuse, the death of his brother, the constant physical abuse and threats to his mother by Sears, and the lies Sears was telling his mother about him. He was also afraid of what would happen if Sears killed his mother.
The defendant admitted, at trial, that he killed Sears. The day after he showed Jones a gun, he left early in the morning to kill Sears, but could not do it. The defendant tried again the next two days, but could not kill Sears. The defendant admitted that on the day of the shooting, he waited outside Sears' apartment for him to turn on the lights. After the lights came on, he walked across the street and waited on the stairs for Sears to exit his apartment. The defendant shot Sears after he exited his apartment. Then, he rolled the defendant over on the ground, shot him again in the back of his head, and took his wallet. The defendant left the scene, and went to his Aunt Pamela's house where he spent the previous night. He gave Rose twenty dollars and Jones one dollar, at their request. He told Rose to throw away his clothes, and went to his mother's house.
Phyllis Baptiste, the defendant's mother, testified that she told several people about the physical and mental abuse Sears inflicted on the defendant and his brother that started in 1988, as well as the abuse that Sears inflicted on her. Bryant Sears, II, the fourteen year old son of Sears and the defendant's mother, testified as to the physical abuse Phyllis Baptiste, as well as defendant and his brother, received from Sears. Sherry Batiste Quincy and Melissa Baptiste, the defendant's aunts, testified about the physical abuse that they personally saw Sears inflict on the defendant, his brother, and their mother. Shirley Baptiste, the defendant's grandmother, testified Sears never touched the defendant and his brother in front of her. She did acknowledge that there were problems in her daughter's relationship with Sears.
In this appeal, defendant's counsel filed a brief in which he alleges three allegations *632 of error, namely that the trial court erred in denying his motion to suppress, that the sentence imposed was excessive, and that the record should be reviewed for patent errors. The defendant also filed a brief pro se, in which he also alleges that the trial court erred in denying his motion to suppress and that the sentence imposed was excessive. Defendant further alleges pro se that the trial court erred in failing to give his requested special jury charge.
Defendant first alleges that it was error to deny his motion to suppress his statement. He argues that he was too intoxicated to waive intelligently his constitutional rights when he confessed. The defendant claims that he told Detective Becnel that he smoked twenty-eight grams of marijuana and took Xanax before he spoke to him. In his pro se brief, the defendant argues that he confessed because Detective Becnel coerced him with the promise of a manslaughter charge. He claims that he never would have confessed if he had not been made this promise.
The State argues that the defendant waived his right to review the trial court's denial of his motion to suppress when he stipulated to the admissibility and introduction of the statement at trial. Alternatively, the State argues that the trial court did not err in denying the motion to suppress because of the defendant's alleged intoxication. Finally, the State argues that any error in admitting the statement was harmless, because of the other evidence presented at trial including the defendant's own corroboratory testimony.
The record reflects that the defendant gave three statements, two of which were recorded. In his September 27, 2003 taped statement, at 1:28 a.m., the defendant gave a detailed account of his commission of the crime. Near the end of his statement, the defendant stated that he had smoked marijuana, in a hollowed out cigar, in the morning before he left to kill Sears and while he was waiting to kill Sears. He agreed when asked that he knew what he was doing when he killed Sears.
Initially we note that the defendant waived his right to appeal the denial of his motion to suppress his confession and the admissibility of the challenged statements. While the defendant filed a written motion to suppress his confession alleging that it was not freely and voluntarily made, because of fear duress, intimidation, menaces, threats, inducements, promises, as well as the failure to advise him of his right to counsel and to remain silent, at trial, the defendant acquiesced to the admission of the statement. The defense counsel stated,
And to make it plainer at this point, we have  in addition to that, we've got the actual transcripts. The defense is willing to stipulate that that [sic] the tape should come into evidence . . . and we're going to pass out the copies to the jury so they can follow along. There is no objection to that as well.
At the above statement makes clear, the defendant waived his right to challenge the admissibility of the statement by his acquiescence in the introduction of that statement into evidence. See State v. Gregory, 05-628 (La.App. 5 Cir. 3/28/06), 927 So.2d 479, 482 and State v. Onezime, 01-1018, p. 10 (La.App. 5 Cir. 2/26/02), 811 So.2d 1033, 1043, writ denied, 02-1099 (La.3/21/03), 840 So.2d 535.
In State v. Onezime, 01-1018 (La.App. 5 Cir. 2/26/02), 811 So.2d 1033, 1043, writ denied, XXXX-XXXX (La.3/21/03), 840 So.2d 535, this Court stated, "where a defendant initially files a pre-trial motion objecting to the introduction of certain evidence, if at trial he specifically agrees to the introduction, *633 he has waived his prior objection and loses the right to present the issue on appeal." Although defendant waived his right to present the issue, this Court in Onezime considered the merits of defendant's claim in light of the constitutional issues raised. Therefore, we will address the merits of defendant's claim. State v. Gregory, supra.
At the hearing on the motion to suppress, Detective Becnel testified that he interviewed the defendant on two occasions. In his first taped statement, the defendant denied any involvement in the death of Sears. Detective Becnel subsequently arrested the defendant. While the defendant was being transported, he was advised of his rights, after which he confessed to killing Sears. During his second taped statement, after waiving his rights, the defendant, again, confessed to killing Sears. Detective Becnel testified that the defendant did not seem high or intoxicated when giving his second taped statement. According to Detective Becnel, he and defendant had no discussion regarding narcotics, and he never discussed a manslaughter charge with the defendant.
At the suppression hearing, the defendant testified that the police told him that they would not release him unless he took a polygraph test, because he had two outstanding warrants. He claimed that Detective Becnel told him that he could get him charged with manslaughter because of the circumstances under which the homicide was committed. The defendant claimed that he would not have given a statement if Detective Becnel had not promised him that he would be charged with manslaughter. He alleged that he smoked twenty-eight grams of marijuana before going to see the police, and that he told someone that he was intoxicated when he gave his statement. He claimed that the transcripts would reflect, "[he] smoked twenty-eight grams of weed a day." The defendant claimed that he was also taking Xanax.
A trial court's determination on the motion to suppress should not be disturbed on appeal, unless it is clearly wrong. State v. Massey, 02-872, p. 3 (La. App. 5 Cir. 2/11/03), 841 So.2d 862, 864, writ denied, 03-805 (La.10/17/03), 855 So.2d 758. The State has the burden of affirmatively showing that a confession was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises before it may be admitted into evidence. LSA-R.S. 15:451; State v. Dewey, 408 So.2d 1255, 1258 (La.1982). If the statement was made during custodial interrogation, the State must also show that the defendant was advised of his constitutional rights. Id.; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, (1966). See, State v. Brown, 03-897 (La.4/12/05), 907 So.2d 1, 15. Whether a defendant's purported waiver of Miranda rights was voluntary is determined by the totality of the circumstances. State v. Pugh, 02-171, p. 11 (La.App. 5 Cir. 10/16/02), 831 So.2d 341, 352. Intoxication only renders a statement involuntary when the intoxication is of such a degree that it negates the defendant's comprehension and renders him unconscious of the consequences of what he or she is saying. State v. Quest, 00-205, p. 6 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, 780, writ denied, 00-3137 (La.11/2/01), 800 So.2d 866. A determination of whether the intoxication existed and was of a degree sufficient to vitiate the voluntariness of the defendant's confession are questions of fact to be determined by the trial court. Id. A diminished intellectual capacity alone does not vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. *634 State v. Pugh, 831 So.2d at 352. A statement obtained from the defendant by direct or implied promises, or by the exertion of improper influence must be considered involuntary and, therefore, inadmissible. State v. Gregory, 927 So.2d at 483. The determination of voluntariness of the statement is made on a case-by-case basis and rests on the totality of the circumstances. Id. The critical factor in a knowing and intelligent waiver is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement. State v. Pugh, 831 So.2d at 352. A trial court's determination on the admissibility and its conclusions on the credibility and weight of the testimony relating to the voluntariness of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Id. An appellate court is not limited to the evidence adduced at the hearing on the motion in determining whether the trial court's ruling on a motion to suppress is correct, it may also consider pertinent evidence presented at the trial. State v. Gregory, 927 So.2d at 483.
In the present case, the defendant never stated that he was under the influence of marijuana and Xanax, or that he used marijuana and Xanax on the same day he gave his statement. Detective Becnel testified that there was no discussion regarding narcotics. In fact, the only discussion regarding narcotics was the defendant's admission that he smoked marijuana the Monday before he killed Sears and the day he killed Sears. The defendant's statement was taken, on September 27, 2003, nine days after the defendant claimed he last used marijuana. In fact, the defendant was able to give a very detailed statement describing facts prior to and on the day of the shooting. He also admitted that he knew what he was doing when he shot Sears. In addition, at the motion to suppress hearing Detective Becnel testified that the defendant did not seem high or intoxicated when giving his second taped statement. Thus the trial court did not err in finding that the defendant was not so intoxicated so as to render his statement involuntary. Compare State v. Jackson, 05-527 (La.App. 5 Cir. 12/27/05), 919 So.2d 779 and State v. Quest 00-205 (La. App. 5 Cir. 10/18/00), 772 So.2d 772, writ denied, 00-3137 (La.11/2/01), 800 So.2d 866.
Second, in the present case, the trial court did not err in denying the motion to suppress the defendant's confession, because the defendant claimed that he was coerced. Detective Becnel testified that he never discussed or promised the defendant that he would be charged with manslaughter. In addition, at the beginning of his statement the defendant acknowledged that he was advised of his rights, understood his rights, and willingly provided the police with a statement regarding the murder. The defendant also indicated that he was signing a waiver of rights form. At the end of his statement, the defendant acknowledged twice that the statement was made of his own free will, and that the police did not force, coerce, or threaten him into giving the statement. He also agreed he was not promised anything in order for him to provide the statement. We find no error in the trial court's determination that defendant's statements were given freely and voluntarily, and the trial judge did not err in admitting them into evidence.
On appeal and in his pro se brief, the defendant argues that his sentence is excessive, because he is a first offender and the homicide was committed because of the years of abuse the victim inflicted on him, his mother, and his brother.
*635 The State argues that the defendant's sentence should only be reviewed for constitutional excessiveness, because he failed to file a motion to reconsider sentence to preserve the issue for appeal. Alternatively, the State argues that the there is a factual basis in the record for the sentence, and that the trial court did not abuse its discretion in sentencing the defendant to the maximum sentence, because a lesser sentence would have deprecated the seriousness of the crime.
In the present case, the defendant failed to file a motion for reconsideration of sentence. LSA-C.Cr.P. art. 881.1(B) requires that a motion to reconsider sentence be made orally at the time of sentencing or in writing thereafter, and that it shall set forth the specific grounds on which the motion is based. "Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude . . . the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review." LSA-C.Cr.P. art. 881.1(E). Therefore, failure to move for reconsideration of sentence or state specific grounds upon which the motion is based limits a defendant to a bare review of the sentence for constitutional excessiveness. State v. Zaldivas, 02-0690, pp. 6-7 (La.App. 5 Cir. 12/30/02), 836 So.2d 577, 582-583, writ denied, 03-0705 (La.10/17/03), 855 So.2d 757.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Wickem, 99-1261, p. 7 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839. In reviewing a sentence for excessiveness, the reviewing court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice. State v. Lobato, 603 So.2d 739, 751 (La.1992).
The three factors considered in reviewing a trial court's sentencing discretion are the nature of the crime, the nature and background of the offender, and the sentence imposed for similar crimes by the same court and other courts. State v. Knightshed, 00-1410, pp. 4-5 (La.App. 5 Cir. 3/28/01), 783 So.2d 501, 504-505, State v. Watts, 99-311, p. 6 (La.App. 5 Cir. 8/31/99), 746 So.2d 58, 64, writ denied, 99-2733 (La.3/24/00), 758 So.2d 145. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. Id., State v. Allen, 03-1205, pp. 3-4 (La.App. 5 Cir. 2/23/04), 868 So.2d 877, 879-880.
The defendant was sentenced to the statutory maximum sentence of forty years for his manslaughter conviction. The trial judge stated that he considered the sentencing guidelines of LSA-C.Cr.P. art. 894.1. In addition, the trial judge, stated that he took into account the youth of the offender and his lack of prior criminal conduct, as well as the significant economic and personal loss to the victim's family, the actions of the victim, and the fact that the exact circumstances were unlikely to recur. The trial judge noted that any lesser sentence would deprecate the seriousness of the crime, and without it, the defendant's lack of self-control might well not improve. Also, the trial judge noted the defendant's actions in shooting the victim twice in the head, which manifested deliberate cruelty in the commission of the crime. Here, the trial judge opined that *636 he, unlike the jury, found that there was sufficient evidence to convict the defendant of the crime charged, second degree murder.
Considering the above factors we find that the trial judge did not abuse his discretion in imposing the maximum sentence.
In his pro se brief, the defendant argues that the trial judge erred denying his request for a special jury charge on justifiable homicide as it relates to the defense of himself and others, because of long-term abuse.
At trial, the defense orally requested that the jury be given a special jury charge on justifiable homicide involving defense of others. Defense counsel argued that the jury should be given the opportunity to decide whether the defendant's actions were mitigated or justified by the facts presented during trial. Specifically, defense counsel referred to evidence presented concerning the defendant's fear, based on years of witnessing the physical abuse of his mother, that his mother would be seriously injured or killed by Sears, like his brother. Also, his fear that his mother's serious injury or death would occur when he was not there, especially in light of the injury his mother sustained shortly before the homicide, which was caused by Sears. The defense counsel noted that the defendant had concluded that he had to intervene and kill Sears in order to protect his mother when he could not be present, because neither police, juvenile officers, nor other members of his family had stopped Sears from beating or injuring his mother.
The Court refused to give the requested charge finding that there was no evidence to the effect that anyone was at risk at the time of the homicide.
LSA-C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. State v. Butler, 462 So.2d 1280, 1285 (La.App. 5 Cir.1985), writ denied, 541 So.2d 886 (La. 1989). The trial court is required to charge the jury on the law applicable to any theory of defense, when properly requested, which the jurors could reasonably infer from the evidence. Id. LSA-C.Cr.P. art. 807 mandates that a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly pertinent and correct. Id. The evidence presented at trial must support the requested special charge. Id.
When a requested special instruction deals with the theory of justification, or self-defense, in a situation in which the person who uses deadly force in self-defense was the initial aggressor, the aggressor doctrine would apply. State v. Spears, 504 So.2d 974, 977 (La.App. 1 Cir. 1987), writ denied, 507 So.2d 225 (La. 1987). LSA-R.S. 14:21 states "a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." An aggressor would have to retreat before he could use deadly force in self-defense, since his initial aggression created the dangerous situation. State v. Spears, 504 So.2d at 977. In situations where the aggressor doctrine applies, a defendant's request for a special instruction dealing with justification or self-defense would be wrong, because the aggressor would have to retreat before he could kill in self-defense. Id.
In this case, the defendant was the aggressor, therefore the requested special jury charge would be wrong or not wholly *637 correct requiring an explanation. We find that the trial court did not err in refusing to charge the jury.
The defendant requests an error patent review. This Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) regardless of whether defendant makes such a request.
Our review finds error in the commitment/minute entry. First, it is inconsistent with the record. It states that the defendant was convicted of the amended charge of manslaughter. The record, however, reflects otherwise. He was convicted of the lesser-included verdict of manslaughter. Second, although this was a jury trial, the commitment/minute entry states that in addition to a jury trial the defendant was informed of his Boykin rights and waived them. Thus a correction of the commitment/minute entry is warranted. See, State v. Yrle, 05-202, p. 4 (La.App. 5 Cir. 10/6/05), 916 So.2d 1197, 1200.
We also observe that the commitment/minute entry is inconsistent with the sentencing transcript. The commitment/minute entry reflects that the trial judge imposed the statutory restrictions prohibiting parole, probation, and suspension of sentence. At sentencing, however the trial judge did not impose these restrictions. It is well settled that when the transcript and the minute entry conflict, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
Therefore, we remand the matter and order the trial court to correct the errors in the commitment/minute entry regarding the guilty plea and the amended charge. In addition, we order that the restrictions on parole eligibility, probation and suspension of sentence be removed. We direct the district court to make the entries in the minutes reflecting these changes and direct the clerk of court to transmit the original of the minute entry to the officer in charge of the institution to which the defendant has been sentenced. LSA-C.Cr.P. art. 892(B)(2). See, State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846.
For the above discussed reasons, the defendant's conviction and sentence are affirmed, and the matter is remanded for correction of the minute entry in accordance with this opinion.
AFFIRMED AND REMANDED.
NOTES
[1] Sears is also referred to by his nickname, "Duck," in some of the testimony.
[2] The two taped statements occurred on September 22 and 27 of 2003.